[No. B207405. Second Dist., Div. Eight. Apr. 16, 2009.]

DAVID MINTZ et al., Plaintiffs and Appellants, v.
BLUE CROSS OF CALIFORNIA et al., Defendants and Respondents.

1596

**1598**

COUNSEL

Shernoff Bidart Darras & Echeverria, Michael J. Bidart, Ricardo Echeverria; The Ehrlich Law Firm and Jeffrey Isaac Ehrlich for Plaintiffs and Appellants.

Reed Smith, Margaret M. Grignon, Kurt C. Peterson, Kenneth N. Smersfelt, Miles M. Cooley and Zareh A. Jaltorossian for Defendants and Respondents.

OPINION

O'NEILL, J.*—

## SUMMARY

The claims administrator under a health insurance plan denied coverage to a plan member for a treatment the administrator deemed investigational. The plan permitted the member to request an independent review of denial of coverage for an experimental or investigational therapy (as required by statute); the administrator advised the member of his general appeal rights, but not of his right to an independent review. The member sued the administrator (not the insurer), alleging causes of action for intentional and negligent interference with contract rights, reckless infliction of emotional distress, and negligence, among others. The trial court sustained the administrator's demurrers to the member's second amended complaint, and the member appealed.

We conclude that (1) the administrator, as the representative of a contracting party (the insurer), may not be held liable for the tort of interfering with its principal's contract; and (2) the denial of health insurance benefits, without more, is not the kind of extreme and outrageous conduct necessary to state a claim for intentional infliction of emotional distress. However, (3) the administrator of a health care plan owes a duty to plan members to exercise due care to protect them from physical injury caused by its negligence in making benefit determinations under the plan. Accordingly, we reverse the judgment of dismissal.

## FACTUAL AND PROCEDURAL BACKGROUND

Judge David Mintz was a member of PERS Choice, a health insurance plan issued and funded by CalPERS (the California Public Employees' Retirement

---

*Judge of the Ventura Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

System). The plan's "Evidence of Coverage" shows that PERS Choice "is a self-funded health plan established and administered by CalPERS (the plan administrator and insurer) through contracts with third-party administrators: Blue Cross of California and Medco."

Blue Cross of California is responsible for administering medical benefits and providing utilization review services under the plan, under contract with CalPERS. (Utilization review is the evaluation of whether health care services are medically necessary, consistent with acceptable treatment patterns, and so on.) When a claim for benefits is denied, a member has various appeal rights in varying circumstances, including an objection in writing to Blue Cross, a request for reconsideration, a "second-level review" by another physician advisor, and so on. If the member is not satisfied with Blue Cross's response, the member may appeal to CalPERS, and various administrative procedures, including an administrative hearing, may occur. A member dissatisfied with the outcome may appeal to the courts, but not until the member has exhausted the appeal process.

The plan, as required by statute, has provisions covering experimental or investigational treatments. It provides that "[a]ny issue as to whether a protocol, procedure, practice, medical theory, or treatment is experimental or investigational will be resolved by Blue Cross, which will have full discretion to make such determination on behalf of the Plan and its participants." If services are denied because Blue Cross determines they are experimental or investigational, an "independent external review" may be requested. This independent review may be requested if (1) the member has a terminal condition; (2) his or her physician certifies that standard therapies have been ineffective or would be inappropriate; and (3) either the member's physician certifies in writing that the denied therapy is likely to be more beneficial than standard therapies, or the member or his or her physician has requested a therapy that, based on documented medical and scientific evidence, is likely to be more beneficial than standard therapies. This independent external review of coverage decisions for experimental or investigational therapies is expressly mandated by Health and Safety Code section 1370.4,[1] and the plan states that the member will be notified of the opportunity to request this review when services are denied.

On October 19, 2006, Blue Cross denied coverage to Judge Mintz of a lung cancer treatment called radio frequency ablation, on the ground it was

---

[1] A health plan's decision to deny experimental or investigational therapies "shall be subject to the independent medical review process under Article 5.55 (commencing with Section 1374.30) except that . . . an independent medical reviewer shall base his or her determination on relevant medical and scientific evidence, including, but not limited to, the medical and scientific evidence defined in subdivision (d)." (Health & Saf. Code, § 1370.4, subd. (b).)

investigational. Blue Cross advised Mintz of his right to file an appeal asking for another review, but not specifically of his right to request an independent external review.[2]

On June 19, 2007, Mintz and his wife sued Blue Cross and Wellpoint, Inc., Blue Cross's owner and operator (collectively, Blue Cross). Their second amended complaint alleged causes of action for tortious breach of the implied covenant of good faith and fair dealing, breach of contract, reckless infliction of emotional distress, intentional interference with contract rights, negligent interference with contract rights, and negligence. As relevant to this appeal, Mintz alleged as follows:

— In November 2001, he was diagnosed with sarcoma on the lung. He underwent a needle biopsy that month, and a wedge resection of his right lower lung in December 2001. In February 2004 three tumors were found, one on his left lung and two on his right lung. He underwent a wedge resection of the lower right lobe in February, and a lobectomy of the lower left lobe in April. A new metastasis was found in the fall of 2004; chemotherapy from October to December 2004 proved ineffective. His lower right lobe was removed in January 2005.

— In February 2006, three more tumors were found; these were inoperable, as Mintz could not afford to lose any more lung tissue. His physicians recommended a procedure known as radio frequency ablation (RFA) followed by a new chemotherapy. Blue Cross approved the RFA, and Mintz received it on March 22, 2006, but the chemotherapy was ineffective and additional tumors were found in June 2006. His physicians decided to perform RFA on the largest of the tumors in July 2006, but the procedure was cancelled as too risky, because of close proximity to a major artery.

— In early August 2006, Mintz received a letter from Blue Cross, indicating it had reviewed the RFA procedure that had been done in March 2006 (and which it had approved), and had decided that RFA was experimental, and would not be covered. (Health & Saf. Code, § 1371.8 prohibits a plan from rescinding an authorization after the provider renders the service in good faith and pursuant to the authorization.)

---

[2] Blue Cross's letter stated: "If you disagree with this decision, you can file an appeal asking for another review. Your appeal will be reviewed and you will be advised of the resolution, in writing, within 30 days of the date your appeal is received. This response will have reasons for the decision and references to plan provisions on which the decision was based. In some cases, when the standard appeal process of 30 days might pose an imminent and/or serious threat to your health, including but not limited to severe pain, the potential loss of life, limb or major bodily function, you have the right to request an expedited, 72-hour appeal. . . ."

— In late August Mintz was seen at Stanford University to explore a form of radiation. The physicians at Stanford thought the method was not appropriate for Mintz, and suggested he consult with Dr. Kee at the University of California at Los Angeles, who was more experienced and more aggressive in treating patients than the radiologist at Stanford. On September 7, 2006, Mintz consulted Dr. Kee; Kee believed he could perform the RFA, even though it was somewhat risky for the reasons given by his other doctors, and that without treatment the metastases were fatal.

— Blue Cross's medical policy, as of August 1, 2006, stated that Blue Cross considers RFA medically necessary for tumors in the liver, but "investigational/not medically necessary" for tumors of the lung, "despite the fact that Blue Cross' own medical policy acknowledges that with mean follow-up of six months, RFA fully ablated tumors in 8 out of 12 patients with tumors smaller than 5 cm, compared with 2 out of 6 patients with larger tumors," and "[t]he study Blue Cross cites in its Medical Policy focused on patients that had potentially resectable disease after failing previous nonoperative treatment."

— In early October, Dr. Kee again recommended the RFA and radiation, as each had a 70 percent chance of being effective, and the RFA was scheduled for October 18, 2006. Kee's office told Mintz that Blue Cross had approved the RFA, but Kee's office had coded it incorrectly (for the liver). On October 17, Mintz was notified by telephone that Blue Cross denied coverage for the RFA. Mintz was informed of the appeal process; his oral notification to Blue Cross of appeal was noted.

— Blue Cross's written denial stated that its peer clinical reviewer, Dr. Williams, had determined that RFA of lung tumors "is deemed investigational and not medically necessary for this 47 year old male because studies to date have been of small populations rejected for surgery and with very short follow-up time plus a large incidence of complications. Larger studies preferably in comparative trials are awaited and necessary. . . . [¶] This decision is based upon the member's specific circumstances and upon peer reviewed criteria including Medical Policy. . . ." However, prior to the denial, neither Dr. Williams nor any other Blue Cross representative ever contacted Mintz or his physicians concerning the medical necessity of the requested treatment.

— It was "apparent to [Mintz] when he received Blue Cross' denial" that (a) Blue Cross's decision was not based on his "specific circumstances," because without the RFA he would die, and (b) Blue Cross had not updated its medical policy, because various articles showed RFA to be effective in treatment of lung tumors, including a study published in 2004 indicating that

"RFA appears to be a safe, minimally invasive procedure for local pulmonary tumor control with low mortality, little morbidity, short hospital stay and gain in quality of life."

— The denial referred in general terms to Mintz's right to file an appeal, but did not contain any notice he was entitled to request an independent external review of a denial of experimental or investigational treatment, both under the plan and under Health and Safety Code section 1370.4. The plan did not explain that the plan must provide the experimental or investigational treatment, if the independent reviewers determine the treatment would be better for the patient than the nonexperimental treatment available under the plan.

— Because Blue Cross refused to permit the RFA treatment recommended by his physicians, and failed to notify him of his contractual and statutory rights to an independent review of the decision to deny RFA, Mintz was unable to have the recommended treatment in conjunction with the radiation and chemotherapy recommended by his physicians.

— Blue Cross was compensated by CalPERS on a per capita basis for each plan member, and also received "some type of direct or indirect financial incentives from CalPERS to reduce the Plan costs. Blue Cross can achieve these incentives, in part, by limiting the cost of coverage it agrees to allow the Plan to provide to Plan members." Based on these facts, Mintz asserted claims for tortious breach of the implied covenant of good faith and fair dealing, breach of contract, reckless infliction of severe emotional distress, intentional interference with contract rights, negligent interference with contract rights, and negligence, and sought compensatory and punitive damages.

Blue Cross's demurrer to Mintz's second amended complaint was sustained with leave to amend, but Mintz did not amend the complaint. An order dismissing the complaint with prejudice was entered on March 27, 2008, and this appeal followed.

### DISCUSSION

Mintz contends the trial court erred in sustaining Blue Cross's demurrer to four causes of action: intentional and negligent interference with contract rights, reckless infliction of emotional distress, and negligence. We conclude the complaint did not state a legal claim for interference with contract rights or for reckless infliction of emotional distress. However, a claims administrator owes a duty of due care to members of a health care plan to avoid physical harm to plan members resulting from its administration

of benefits under the plan, and accordingly Blue Cross's demurrer to Mintz's cause of action for negligence should have been overruled.

A demurrer tests the legal sufficiency of the complaint; we review the complaint de novo to determine whether it alleges facts sufficient to state a cause of action. For purposes of review, we accept as true all material facts alleged in the complaint, but not contentions, deductions or conclusions of fact or law. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) If facts in exhibits attached to the complaint contradict the facts alleged, the facts in the exhibits take precedence. (*Holland v. Morse Diesel Internat., Inc.* (2001) 86 Cal.App.4th 1443, 1447 [104 Cal.Rptr.2d 239].) We discuss the causes of action at issue in turn.

### 1. *Interference with contract rights.*

■ "[A] stranger to a contract may be liable in tort for intentionally interfering with the performance of the contract." (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 [270 Cal.Rptr. 1, 791 P.2d 587] (*Pacific Gas*).) The elements necessary to state a cause of action for intentional interference with contractual relations are "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." (*Ibid.*)

As a literal matter, Mintz has stated each of the elements recited in *Pacific Gas*: an insurance contract between him and CalPERS, Blue Cross's obvious knowledge of the contract, and Blue Cross's acts disrupting the benefits due Mintz under the contract, to his detriment. But only "a stranger to [the] contract" may be liable for interfering with it. (See *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 513, 507, 514 [28 Cal.Rptr.2d 475, 869 P.2d 454] (*Applied Equipment*) [a contracting party cannot be held liable in tort for conspiracy to interfere with its own contract; "[t]he tort duty not to interfere with the contract falls only on strangers— interlopers who have no legitimate interest in the scope or course of the contract's performance"].) So, the pertinent question is whether Blue Cross is "a stranger" to the health insurance contract between Mintz and CalPERS. We conclude it is not, and accordingly Mintz cannot state a cause of action for intentional interference with contract rights.

First, the contract of insurance attached to the complaint—the "Evidence of Coverage"—by its terms establishes that Blue Cross acts as an agent for CalPERS in administering the contract of insurance. While Mintz alleges that Blue Cross "was not acting in the course and scope of its agency for

CalPERS," that is a conclusion we need not and do not accept as true, and the complaint alleges no facts that would support that conclusion.

Second, it is settled that "corporate agents and employees acting for and on behalf of a corporation cannot be held liable for inducing a breach of the corporation's contract." (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 24, 25 [276 Cal.Rptr. 303, 801 P.2d 1054] (*Shoemaker*) [where defendants were agents of the employer who were "vested with the power to act for the employer (rightly or wrongly)" they "stand in the place of the employer, because the employer . . . cannot act except through such agents"]; cf. *Applied Equipment, supra,* 7 Cal.4th at p. 512, fn. 4 [under "agent's immunity rule," agents and employees of a corporation " 'cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage' "; rule " 'derives from the principle that ordinarily corporate agents and employees acting for or on behalf of the corporation cannot be held liable for inducing a breach of the corporation's contract' "].) In this case, Blue Cross is CalPERS's agent: for purposes of claims administration under the insurance contract between Mintz and CalPERS, Blue Cross was vested with the power to act for CalPERS, and therefore cannot be held liable for interference with the very contract it was charged with administering. (See also *PM Group, Inc. v. Stewart* (2007) 154 Cal.App.4th 55, 57–58, 65 [64 Cal.Rptr.3d 227] (*PM Group*) ["a contracting party is incapable of interfering with the performance of his or her own contract and cannot be held liable in tort for conspiracy to interfere with his or her own contract"; because subcontracts at issue provided for the defendant-entertainer's performance, neither the entertainer nor his representatives—his manager, his lawyer, and his agent—could be liable for the tort of interfering with the subcontracts].)[3]

---

[3] Mintz relies on *Woods v. Fox Broadcasting Sub., Inc.* (2005) 129 Cal.App.4th 344 [28 Cal.Rptr.3d 463] (*Woods*), where this court held that a major shareholder (49.5 percent) in a corporation *could* be liable for interfering with a contract between the corporation and the plaintiff. (*Id.* at p. 350.) *Woods* pointed out that in *Applied Equipment* and all the decisions it cited, "it was clear that the defendant was either a contracting party *or its agent* who could not be liable for interference" rather than "noncontracting parties who had some general economic interest or other stake in the contract." (*Woods, supra,* 129 Cal.App.4th at pp. 352, 353, italics added [also noting "the rule that owners and managers may be held liable in tort for contract interference when they were not acting to protect the interest of the contracting party"].) In short, *Woods* merely concludes that a shareholder is not automatically immune from liability for interfering with the contractual obligations of the company in which it holds shares (*id.* at p. 353); *Woods* does not stand for the proposition that the agent of a contracting party may be liable for interference with its principal's contract.

Mintz points out that he alleged Blue Cross was "acting for its own financial advantage" when it denied coverage for the RFA,[4] and that the "agent's immunity rule" does not apply when the agents are acting "as individuals for their individual advantage." (See *Applied Equipment, supra,* 7 Cal.4th at p. 512, fn. 4; *Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39, 47 [260 Cal.Rptr. 183, 775 P.2d 508] (*Doctors' Co.*) [the rule "does not preclude the subjection of agents to conspiracy liability for conduct which the agents carry out 'as individuals for their individual advantage' and not solely on behalf of the principal"]; *1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 592 [132 Cal.Rptr.2d 789] (*1-800 Contacts*) ["[a]n exception to the agent's immunity, for conduct undertaken for personal advantage, is consistent with the immunity rule, because pursuit of a personal interest renders the actor more than merely the agent of another"].) While Mintz's statement is correct, the "individual advantage" exception to the agent's immunity rule is of no help to him.

First, the "agent's immunity rule" has no direct applicability to a claim for interference with contract rights. The rule is simply that "duly acting agents and employees cannot be held liable for conspiring with their own principals . . . ." (*Applied Equipment, supra,* 7 Cal.4th at p. 512.) While the agent's immunity rule " '*derives from* the principle that ordinarily corporate agents and employees acting for or on behalf of the corporation cannot be held liable for inducing a breach of the corporation's contract' " (*Applied Equipment, supra,* 7 Cal.4th at p. 512, fn. 4, italics added), the rule, on its face, applies only to claims of conspiracy to commit a tort or violate a statute. (See, e.g., *Doctors' Co., supra,* 49 Cal.3d at pp. 41, 45 [because noninsurer defendants (insurer's retained attorney and expert witness) were not subject to insurer's statutory duty to attempt to effectuate a settlement, and were acting merely as agents of the insurer and not as individuals for their individual advantage, " 'they cannot be held accountable on a theory of conspiracy' "].) As the court stated in *1-800 Contacts,* "the exception for conduct undertaken in pursuit of a personal interest or advantage *applies only to the agent's immunity rule.* It does not relax the requirement that to be liable for conspiracy to breach a duty, the defendant must be bound by that duty and capable of breaching it." (*1-800 Contacts, supra,* 107 Cal.App.4th at p. 592, italics added.) Mintz has not alleged that Blue Cross conspired with CalPERS to do anything, and hence neither the agent's immunity rule nor its exception

---

[4] Mintz alleged that: "Blue Cross, acting for its own financial interests, determined to deny [Mintz] benefits under the Plan, and interfered with his rights to obtain the Plan benefits, by engaging in the conduct alleged above, including by its improper refusal to provide benefits, and its failure to advise [Mintz] of his statutorily-required appeal rights." Further, "[Mintz] is informed and believes, and thereon alleges, that Blue Cross engaged in this conduct for the purpose of obtaining financial incentives available to it under the Plan for keeping plan costs down, and also because it was concerned that its approval of the RFA treatment for [Mintz] would create a precedent under its own health plans."

has any literal application in this case. The only question is whether the representative of a contracting party may be held liable for the substantive tort of interfering with the contract. The cases answer that question in the negative. (See *Shoemaker, supra,* 52 Cal.3d at pp. 24–25; *PM Group, supra,* 154 Cal.App.4th at p. 65.)

Second, the conclusion that there is no "financial advantage" exception to the rule that a corporate agent cannot be liable for interfering with its principal's contract makes good sense. Every agent, in one way or another, acts for its own financial advantage when it acts for its principal, because the agent is compensated by its principal, and conduct in furtherance of the principal's interest will necessarily serve the agent's interests as well. A "financial advantage" exception to the sound rule that the contracting party's agent, like the contracting party, cannot be liable for interference with the contract, would entirely swallow up the rule.

Third, even if a "financial advantage" exception were applicable to the rule that an agent cannot be liable for interfering with its principal's contract, the cases discussing the exception to the agent's immunity rule demonstrate that merely receiving monetary compensation for its services to the principal is not enough. As stated in *Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.* (2005) 131 Cal.App.4th 802, 834 [32 Cal.Rptr.3d 325] (*Berg & Berg*), "[c]ases have interpreted the 'financial advantage' exception to the agent's immunity rule to mean a personal advantage or gain that is over and above ordinary professional fees earned as compensation for performance of the agency." *Berg & Berg* involved a statutory provision with exceptions that allowed a conspiracy claim against an attorney; the exceptions mirrored those carved out from the agent's immunity rule. The court held the term " 'in furtherance of the attorney's financial gain' " meant that "through the conspiracy, the attorney derived economic advantage *over and above monetary compensation received in exchange for professional services actually rendered* on behalf of a client." (*Id.* at pp. 824, 836, italics added.) Even allegations of excessive billing for the services rendered by the attorney did not satisfy the financial gain requirement of the statute's exception. (*Id.* at pp. 835–836.)

In short, the agent's immunity rule, with its exceptions, applies to civil conspiracy claims, which this is not. And, even if the "financial advantage" exception could be applied in the context of a claim for interference by an agent with its principal's contract, Mintz's allegations that Blue Cross was "acting for its own financial interests," and "engaged in this conduct for the purpose of obtaining financial incentives available to it under the Plan for keeping plan costs down," would be insufficient to state the necessary

economic advantage "over and above" the compensation received in exchange for Blue Cross's services to CalPERS. (*Berg & Berg, supra,* 131 Cal.App.4th at p. 836.)

■ Finally, Mintz relies on *Wilson v. Blue Cross of So. California* (1990) 222 Cal.App.3d 660 [271 Cal.Rptr. 876] (*Wilson*). In *Wilson,* the court held there were triable issues of fact as to the liability of a third party (Western Medical), hired by the insurer to perform concurrent utilization reviews of the medical necessity of hospitalizations for its insureds, for tortious interference with the contract of insurance (and as to Western Medical's role in causing the wrongful death of the decedent). (*Id.* at p. 674.) In *Wilson,* Western Medical decided, contrary to the terms of the insurance contract, not to approve further hospitalization, and there was evidence its decision was a substantial factor in bringing about the insured's subsequent suicide. (*Id.* at p. 672.) *Wilson* is inapplicable for at least two reasons. First, cases are not authority for issues not raised or decided, and the issue whether an agent can be held liable, as a matter of law, for interfering with its principal's contract was apparently not raised by Western Medical. Second, and more importantly, *Wilson* predates the Supreme Court's decisions in *Shoemaker,* holding that a corporate agent cannot be held liable for inducing a breach of the corporation's contract (*Shoemaker, supra,* 52 Cal.3d at p. 24) and *Applied Equipment,* holding that the tort duty not to interfere with a contract "falls only on strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance." (*Applied Equipment, supra,* 7 Cal.4th at p. 514.) Consequently, *Wilson* is not persuasive authority on the point at issue.

Because the representative of a contracting party may not be held liable for the tort of interfering with its principal's contract, Mintz cannot state a cause of action against Blue Cross for intentional interference with contract rights.[5]

### 2. *Intentional infliction of emotional distress.*

■ To state a cause of action for intentional infliction of emotional distress, the plaintiff must allege (1) extreme and outrageous conduct with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. (*Hailey v. California Physicians' Service*

---

[5] A party to a contract cannot be liable for intentional *or* negligent interference with the contract. (*Woods, supra,* 129 Cal.App.4th at p. 350.) Because, as we have held, the representative of a contracting party likewise may not be held liable for intentional interference with its principal's contract, it necessarily follows that no liability will lie for the representative's negligent interference with the contract.

(2007) 158 Cal.App.4th 452, 473–474 [69 Cal.Rptr.3d 789] (*Hailey*).) Further, the conduct alleged "must be ' "so extreme and outrageous 'as to go beyond all possible [bounds] of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " ' " (*Id.* at p. 474.) Mintz and his wife assert that Blue Cross's conduct denying plan benefits and failing to advise Mintz of his right to independent review of its denial amounted to reckless infliction of emotional distress.[6] We disagree.

■ Under some circumstances, "a health care plan's conduct in handling a claim may result in liability for intentional infliction of emotional distress." (*Hailey, supra*, 158 Cal.App.4th at p. 473.) However, courts have rejected liability where the insurer "simply delayed or denied insurance benefits . . . ." (*Id.* at p. 474, citing cases.) In *Coleman v. Republic Indemnity Ins. Co.* (2005) 132 Cal.App.4th 403 [33 Cal.Rptr.3d 744] (*Coleman*), the court held that an insurer's conduct—misleading the plaintiffs as to the applicable statute of limitations and advising the plaintiffs not to obtain the services of an attorney—did not reach the level of outrageousness necessary to support a cause of action for intentional infliction of emotional distress; the plaintiffs' claims were based on violations of statutory duties under Insurance Code section 790.03, and it was "well-settled" that the violation of those statutory duties does not in itself constitute the type of outrageous conduct that will support a cause of action for intentional infliction of emotional distress. (*Coleman, supra*, 132 Cal.App.4th at pp. 406, 417.) Similarly, in *Ricard v. Pacific Indemnity Co.* (1982) 132 Cal.App.3d 886, 889, 895 [183 Cal.Rptr. 502], allegations that the insurer refused to properly investigate a claim and accused the insured of " 'trying to put something over on' " the insurer did not constitute outrageous behavior. Conversely, as *Hailey* points out, an insurer's conduct *was* outrageous in *Fletcher v. Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376 [89 Cal.Rptr. 78]. In *Fletcher*, the insurer "embarked upon a concerted course of conduct to induce plaintiff to surrender his insurance policy or enter into a disadvantageous 'settlement' of a nonexistent dispute by means of false and threatening letters and the employment of economic pressure based upon his disabled and, therefore impecunious, condition, (the very thing insured against) exacerbated by [the insurer's] malicious and bad faith refusal to pay plaintiff's legitimate claim." (*Fletcher, supra*, 10 Cal.App.3d at p. 392.)

---

[6] The complaint alleges: "[A]t the time of [Blue Cross's] wrongful acts, [Blue Cross] knew [Mintz's] cancer was life threatening . . . ; knew their insured was extremely vulnerable due to his deteriorating health and desperate need to obtain adequate treatment, knew that [Mintz] was entitled to medically necessary care under the Plan, so as to constitute extreme and outrageous conduct." And: "Defendants' conduct is further deplorable, given that defendants engaged in the . . . conduct for their own financial gain by attempting to avoid the costly treatments [Mintz's] condition required, without concern that doing so put [Mintz's] life at risk."

We conclude Mintz has not, as a matter of law, alleged conduct that is extreme, outrageous, beyond the bounds of decency, atrocious, or intolerable in a civilized society. The denial of benefits for an experimental treatment to a terminally ill patient may arouse our sympathy, but it cannot be regarded, standing alone, as outrageous conduct. Mintz relies on *Hailey*, pointing out that *Hailey* permitted the plaintiffs to proceed to trial against their health care insurer, based on its attempts to rescind their coverage. (*Hailey, supra*, 158 Cal.App.4th at p. 476.) But *Hailey* does not support Mintz's claim that Blue Cross's conduct was outrageous. Indeed, *Hailey* expressly tells us that a health care plan "does not subject itself to liability for intentional infliction of emotional distress by attempting in good faith to assert its perceived legal right to rescind a health care services contract, *even if it is likely the subscriber will suffer emotional distress.*" (*Ibid.*, italics added.) In *Hailey*, there was more: the insurer obtained information entitling it to rescind, yet adopted a "wait and see" attitude, continuing to collect premiums and deliberately forgoing rescission until after the subscriber suffered a serious illness; the facts alleged showed the rescission may not have been because of omissions in the insurance application, but because of the substantial medical bills resulting from an automobile accident. (*Ibid.*)

█ The only conduct alleged here is the denial of benefits for an investigational treatment and the failure to advise the insured of his statutory right to independent review of the denial. The precedents are clear that, without more, Mintz's allegations do not state a claim for intentional infliction of emotional distress as a matter of law.

### 3. *Negligence.*

█ "An action in negligence requires a showing that the defendant owed the plaintiff a legal duty, that the defendant breached the duty, and that the breach was a proximate or legal cause of injuries suffered by the plaintiff." (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673 [25 Cal.Rptr.2d 137, 863 P.2d 207].) The trial court sustained Blue Cross's demurrer to Mintz's negligence cause of action, with leave to amend, observing that Mintz "has not made it clear . . . as to what Blue Cross's relationship is and what conduct by Blue Cross constituted negligence . . . ." Mintz declined to amend. His complaint alleged that:

— "By virtue of the duties that it is called on to perform under the Plan . . . , Blue Cross was under a duty to use ordinary care in the manner it carried out its responsibilities, including without limitation the manner in which it processed claims, made determinations concerning medical necessity, made determinations about whether treatments were experimental and investigational, and the manner in which it informed Plan members of their statutory rights under [Health and Safety Code section 1370.4]."

— This duty extended to Mintz, and was breached by Blue Cross's failure to use ordinary care in the manner in which it processed Mintz's claims, made determinations of what treatments were medically necessary and what treatments were investigational, and notified him (or failed to notify him) of his right to independent review under Health and Safety Code section 1370.4.

— Blue Cross's breaches of the duties it owed Mintz were "a substantial factor in causing him financial harm, physical harm, and emotional harm, causing him to suffer general and special damages in an amount to be proven at trial."

Mintz argues the trial court erred in sustaining Blue Cross's demurrer to his negligence claim, and both parties treat the pertinent question as whether the threshold element in a cause of action for negligence—"the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion"—exists in this case. (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 [11 Cal.Rptr.2d 51, 834 P.2d 745] (*Bily*).) We conclude that it does, and Blue Cross's demurrer to Mintz's cause of action for negligence should have been overruled.

We begin with the basic principles: "Liability for negligent conduct may only be imposed where there is a duty of care owed by the defendant to the plaintiff or to a class of which the plaintiff is a member. [Citation.] A duty of care may arise through statute or by contract. Alternatively, a duty may be premised upon the general character of the activity in which the defendant engaged, the relationship between the parties or even the interdependent nature of human society. [Citation.]" (*J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 803 [157 Cal.Rptr. 407, 598 P.2d 60] (*J'Aire*).) Whether a duty of care is owed is a legal question (*Bily, supra*, 3 Cal.4th at p. 397), and is decided on a case-by-case basis. (*J'Aire, supra*, 24 Cal.3d at p. 806.)

■ In this case, Mintz alleges Blue Cross had a duty of due care to Mintz "by virtue of the duties that it is called upon to perform under the Plan . . . ." When parties are, as here, not in privity, " '[t]he determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors . . . .' " (*Bily, supra*, 3 Cal.4th at p. 397, quoting *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16] (*Biakanja*); see also *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 342 [134 Cal.Rptr. 375, 556 P.2d 737] [whether a duty to exercise reasonable care to a particular plaintiff exists "depends on a judicial weighing of the policy considerations for and against the imposition of liability under the circumstances"].) Among the factors to be balanced are " 'the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the

closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.' " (*Bily, supra,* 3 Cal.4th at p. 397, quoting *Biakanja, supra,* 49 Cal.2d at p. 650.)

Here, as we shall see *post,* application of the criteria identified in *Bily* and *Biakanja* compels us to conclude that the administrator of a health care plan owes a duty to plan members to exercise due care to protect them from physical injury caused by its negligence in making benefit determinations under the plan. In contending that Blue Cross owes no such duty, Blue Cross points out that it is CalPERS's agent, that the acts alleged all took place within the course and scope of Blue Cross's agency, that any liability would be merely redundant of CalPERS's liability, and that because CalPERS as the insurer cannot be liable in negligence, the court should not create a negligence duty as to the insurer's agent. Blue Cross relies on *Sanchez v. Lindsey Morden Claims Services, Inc.* (1999) 72 Cal.App.4th 249, 250 [84 Cal.Rptr.2d 799] (*Sanchez*), where the court held that an independent adjuster engaged by a cargo insurer owed no duty of care to the claimant-insured, with whom the adjuster had no contract. We first consider the criteria identified in *Biakanja* and subsequent cases, and then explain why *Sanchez*'s analysis is inapposite where an agent's negligence is alleged to have caused physical harm to an insured.

### a. *The* Biakanja *factors*

As *Biakanja* tells us, as of the late 19th century, it was generally accepted that, with few exceptions, there was no liability for negligence committed in the performance of a contract in the absence of privity. (*Biakanja, supra,* 49 Cal.2d at p. 649.) But by the time *Biakanja* was decided, the rule had been "greatly liberalized," and courts "have permitted a plaintiff not in privity to recover damages in many situations for the negligent performance of a contract." (*Ibid.*) A prime example cited in *Biakanja* was the imposition of liability upon suppliers of goods and services "which, if negligently made or rendered, are 'reasonably certain to place life and limb in peril.' " (*Ibid.*) The court went on to make its now familiar observation that the determination whether, in a specific case, a duty is owed is a matter of policy involving the balancing of the factors enumerated above. (*Id.* at p. 650.) The Supreme Court in the later case of *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561] (*Rowland*) put the point a slightly different way. *Rowland* observed that Civil Code section 1714 has long provided that "[e]veryone is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person . . ." (Civ. Code, § 1714, subd. (a)), and that in the absence of a statutory exception to that fundamental principle, "no such

exception should be made unless clearly supported by public policy" (*Rowland, supra,* 69 Cal.2d at p. 112). As *Rowland* stated, "[a] departure from this fundamental principle [enunciated by section 1714] involves the balancing of a number of considerations . . . ." (*Id.* at pp. 112–113; see also *Christensen v. Superior Court* (1991) 54 Cal.3d 868, 885 [2 Cal.Rptr.2d 79, 820 P.2d 181] ["[i]n determining liability for negligence, we begin always with the command of Civil Code section 1714 . . . ."; exceptions "are recognized only when clearly supported by public policy"].) In addition to the criteria cited in *Biakanja, Rowland* identified as "major" considerations "the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland, supra,* 69 Cal.2d at p. 113.)

Several of the *Biakanja/Rowland* factors need little explanation, as they clearly weigh in favor of imposing a duty of care on Blue Cross. First, the "transaction" here—Blue Cross's utilization review responsibility under the Mintz/CalPERS health insurance plan (evaluating whether health care services are medically necessary, and so on)—is obviously intended to, and necessarily does, affect the members of the plan. Second, it is certainly foreseeable that plan members may suffer harm if decisions on, say, the medical necessity of a treatment are imprudently made. Third, the "moral blame" from an erroneous decision to withhold a medical treatment is equally apparent. (Cf. *National Union Fire Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Services Group, Inc.* (2009) 171 Cal.App.4th 35, 47 [89 Cal.Rptr.3d 473] ["[n]egligence in the execution of contractual duties is generally held to be morally blameworthy conduct"].) Fourth, the policy of preventing future harm would necessarily be served by imposing negligence liability on the entity directly responsible for making health care determinations affecting plan members.

The other two *Biakanja* factors are the degree of certainty that Mintz suffered injury, and the closeness of the connection between Blue Cross's conduct and the injury suffered. On the facts pleaded in this case, the certainty of injury is less than clear. While Mintz alleges that "the manner in which [Blue Cross] processed [his] claims" and failed to notify him of his right to an independent review was "a substantial factor in causing him financial harm, physical harm, and emotional harm," the complaint is silent on the nature of the "physical harm" he suffered as a result of not undergoing the RFA treatment, or as a result of Blue Cross's failure to tell him that he was entitled to an independent review of Blue Cross's denial. (Cf. *Bily, supra,* 3 Cal.4th at p. 398 [noting "the difficult and potentially tenuous causal relationships" between the negligent audit reports and the plaintiffs' economic losses from investment decisions].) However, while problems of causation may be significant in this case, we cannot conclude there is no duty based on

that factor, given the strength of the other considerations just discussed. (If physical harm *was* caused by Blue Cross's conduct, "the closeness of the connection between the defendant's conduct and the injury suffered" (*Biakanja, supra,* 49 Cal.2d at p. 650) is apparent.) And, we can certainly conjure circumstances in which the certainty of injury flowing from an administrator's conduct in processing a claim would be entirely clear, as where a denial of treatment covered by the insurance contract results in an identifiable physical injury or death to the insured. (Cf. *Wilson, supra,* 222 Cal.App.3d 660 [involving wrongful death claim against third party administrator who refused hospitalization, contrary to insurance contract, resulting in suicide of insured].)

In sum, application of the *Biakanja* criteria show that a third party administrator of a health care plan owes a general duty of care to plan members to protect them from physical injury flowing from its administration of claims and benefits under the plan.

### b. Bily *and* Sanchez.

Blue Cross resists this conclusion, relying on *Sanchez, supra,* 72 Cal.App.4th 249, where the court found no duty of care owed to an insured by an independent claims adjuster hired by the insurer to investigate and adjust losses. In *Sanchez,* the adjuster's three-month delay in paying a claim for cargo damage resulted in business losses to the cargo owner, who sued and obtained a judgment against the insured for more than $1.3 million. (*Id.* at p. 251.) In finding no duty, *Sanchez* in turn relied on *Bily, supra,* 3 Cal.4th 370, in which the Supreme Court concluded that accountants owed no general duty of care, to persons other than their client, in the conduct of an audit of the client's financial statements, so that investors who foreseeably relied on a negligently prepared audit opinion could not sue the auditors for negligence when their investments were lost. (*Bily, supra,* 3 Cal.4th at pp. 376–378.) But neither *Bily* nor *Sanchez,* both of which involved purely economic losses, is comparable in any fundamental sense to the circumstances here, where the question is whether a third party administrator of health care benefits should have a duty of care to plan members who may suffer physical harm from decisions to deny treatments. In addition, most of the Supreme Court's "central concerns" in *Bily,* and the Court of Appeal's application of them in *Sanchez,* simply do not apply in the context of a health insurance plan.[7] Thus:

[7] Blue Cross also cites *Keene v. Wiggins* (1977) 69 Cal.App.3d 308, 316 [138 Cal.Rptr. 3] (*Keene*), and *Felton v. Schaeffer* (1991) 229 Cal.App.3d 229, 234 [279 Cal.Rptr. 713] (*Felton*), in support of its contention that it owes no duty of care to Mintz. In *Keene,* the court held that a doctor hired by a workers' compensation insurer to evaluate a disabled employee owed no duty to the employee, and in *Felton,* the court held that a doctor hired by an employer to perform preemployment physical examinations owed no duty to an applicant for employment.

In *Bily*, the court's "central concerns" were that (1) given the secondary "watchdog" role of the auditor, the complexity of audit opinions, and the potentially tenuous causal relationships between audit reports and economic losses from investment decisions, allowing liability to all foreseeable third parties would subject auditors to potential liability far out of proportion to their fault; (2) the more sophisticated class of plaintiffs in auditor liability cases permitted the effective use of contract rather than tort liability to control and adjust the risks through "private ordering" (as where investors could "privately order" the risk of inaccurate financial reporting by contractual arrangements with the client); and (3) the effect of imposing a duty on auditors to third persons was such that the costs outweighed the benefits (the court doubted that improvements in audit care would result from an expanded rule of liability, and that deleterious economic effects (increases in audit costs and decreases in availability of audit services) were just as likely to occur). (*Bily, supra*, 3 Cal.4th at pp. 398, 403–405.) But, with the possible exception of the last, cost-benefit factor (which we address, *post*), the *Bily* concerns do not apply here. Blue Cross's role, unlike the auditor's, is not "secondary"; it has primary responsibility for making benefit determinations. From a plan member's perspective, CalPERS and Blue Cross (or whatever entity CalPERS may appoint to administer the plan) are a single package, with Blue Cross as the entity dealing directly with the plan member on his or her health care claims on a regular basis. Blue Cross's role is in stark contrast to that of the auditors in *Bily* and the adjuster in *Sanchez*, who had no ongoing relationship with the plaintiffs in those cases. With Blue Cross primarily responsible for benefit determinations, it is hard to see how imposing liability for careless determinations would subject Blue Cross to liability out of proportion to fault. And health care plan members are obviously not a "more

---

But *Keene* and *Felton* have nothing in common with this case except a connection to the health care industry. In *Keene*, the plaintiff alleged medical malpractice in connection with a report the doctor wrote for the insurer rating the plaintiff's injury, claiming he relied on the report to his detriment. (*Keene, supra*, 69 Cal.App.3d at pp. 310–311.) In *Felton*, the plaintiff alleged negligence by the doctor in connection with a preemployment physical examination, based on the doctor's erroneous report of a hypertension problem, resulting in the plaintiff's failing to get the job for which he was applying. (*Felton, supra*, 229 Cal.App.3d at pp. 233–234, 238.) In both cases, the physician was hired to provide a report for the benefit of the employer, not the examinee, and in neither case did the examinee receive medical treatment or advice from the doctor. (*Felton, supra*, 229 Cal.App.3d at p. 236.) Both courts pointed out that where no physician-patient relationship exists, the doctor's only duty is to conduct the examination in a manner not to cause harm to the person being examined. (*Keene, supra*, 69 Cal.App.3d at p. 313; *Felton, supra*, 229 Cal.App.3d at pp. 235–236.) As *Felton* noted, "there is no suggestion Felton was *physically harmed* by . . . allegedly negligent advice" (*Felton, supra*, 229 Cal.App.3d at p. 236, fn. 4), and as *Keene* noted, "[h]ad [the physician] volunteered care or treatment or otherwise attempted to serve or benefit [the plaintiff] in a direct manner, we would undoubtedly find a duty running to [the plaintiff] . . ." (*Keene, supra*, 69 Cal.App.3d at p. 316, fn. 4). Here, Blue Cross's essential function as administrator of the health plan is to "serve or benefit" plan members "in a direct manner" (*ibid.*), and it accordingly has a duty to plan members to protect them from physical harm resulting from its administration of the plan.

sophisticated class of plaintiffs" (*Bily, supra,* 3 Cal.4th at p. 398) who could protect themselves with other contractual arrangements.

Similarly, the considerations relied on in *Sanchez* are not persuasive in the context of the administration of a health care plan, as opposed to the adjustment of economic losses under an insurance policy. *Sanchez* pointed out that:

— The insurer-retained adjuster is subject to the control of its client, the insurer, which has the ultimate power to pay or deny a claim. (*Sanchez, supra,* 72 Cal.App.4th at p. 253.) And while the insurer's liability is circumscribed by policy limits, conditions and exclusions, the adjuster has no opportunity to limit its liability by contract. So while the claims adjuster's role is "secondary," imposing a duty of care could expose the adjuster to liability greater than that faced by its principal. (*Ibid.*)

— A duty to the insured would conflict with the adjuster's duty to the insurer who engaged the adjuster, as insureds and insurers often disagree on coverage or amount of loss. (*Sanchez, supra,* 72 Cal.App.4th at p. 253.)

— The costs of imposing a duty of care would outweigh the potential benefits; the adjuster is already deterred from neglect by its exposure to liability to the insurer for breach of contract or indemnity, and imposing liability on the adjuster would be redundant in most cases, since the insurer would also be liable. (*Sanchez, supra,* 72 Cal.App.4th at p. 254.) The costs of imposing a duty, on the other hand, would be "substantial"; adjusters would have to buy insurance against the liability or create their own cash reserves, and premiums would rise, so insureds would pay more without obtaining more value. (*Ibid.*)

In our view, the considerations identified in *Sanchez* must necessarily be weighed differently when the result of a lack of due care is physical injury from the withholding of medical treatments. First, as we have already noted, even though CalPERS has ultimate responsibility, by virtue of the appeal process, for denial of claims, Blue Cross's role in determining whether treatments will be covered is by no stretch of the imagination "secondary." Second, we cannot give much credence to Blue Cross's claim that imposing a duty of care would subject Blue Cross to "conflicting obligations." (See *Sanchez, supra,* 72 Cal.App.4th at p. 253.) Certainly Blue Cross has a contractual obligation to CalPERS, but its obligation is to administer the contract between CalPERS and its plan members in accordance with its terms. It is hard to see how a duty to plan members to use due care in doing so could possibly conflict with the performance of Blue Cross's obligations to CalPERS. After all, the subject of the contract is the health care of plan

members. Presumably all parties share the objective of maintaining the wellness of plan members within the confines of the plan. At oral argument, Blue Cross suggested, in response to questions about conflicting obligations, that imposing a duty could cause it to grant claims it might otherwise deny, in order to avoid being sued by plan members. We find this a dubious proposition, particularly if, as the complaint alleges, Blue Cross receives financial incentives from CalPERS for reducing costs. Nor would there seem to be any conflict with Blue Cross's duties to CalPERS in this case, as the plan gives Blue Cross "full discretion" to resolve any issue as to whether a treatment is experimental or investigational. But the fundamental point is that if Blue Cross performs its duties in accordance with the terms of the health care plan, it will satisfy its obligations both to CalPERS and to plan members. And, in the context of a health insurance contract, we simply cannot conclude that a duty to the insured plan members to use due care to avoid physical harm would "interfere with . . . faithful performance" of Blue Cross's obligation to CalPERS (*Sanchez, supra,* 72 Cal.App.4th at p. 253); sound public policy suggests precisely the contrary.

The only remaining consideration is whether the costs of imposing a duty of care would outweigh the potential benefits, as was the case in *Bily* and *Sanchez.* (See *Rowland, supra,* 69 Cal.2d at p. 113 [among the major considerations in determining whether to depart from the fundamental rule that one is responsible for his own negligence are "the extent of the burden to the defendant and consequences to the community of imposing a duty . . . and the availability, cost, and prevalence of insurance for the risk involved"].) Here again, the balance is different when the risk involved is physical injury or death, rather than pure economic loss. While Blue Cross points to the increased costs of health insurance premiums, compared with "little or marginal benefit [to] insureds," it ignores the less measurable but nonetheless critically important benefit to plan members (and the community) of deterring careless conduct resulting in physical harm to persons in need of medical care.

■ One final note: Blue Cross stresses its status as an agent of CalPERS, and suggests that because CalPERS, as the insurer, cannot be liable in negligence, the court should not create a negligence duty as to the insurer's agent. But, under the general law of agency, while an agent may not be liable for economic losses to third parties, "[a]n agent's mere failure to perform a duty owed to the principal may render the agent liable to third persons who rely on the agent's undertaking, where there is physical damage to person or property." (3 Witkin, Summary of Cal. Law (10th ed. 2005) Agency and Employment, § 199, p. 252; see *Sanchez, supra,* 72 Cal.App.4th at p. 255.)

In sum, when we put all the *Biakanja, Rowland,* and *Bily* criteria in the balance, we harbor no doubt that Blue Cross, as a third party claims

administrator for a health care plan, owes a general duty of due care to plan members to avoid physical harm to them resulting from its administration of benefits under the plan. Consequently, the trial court erred in sustaining Blue Cross's demurrer to Mintz's cause of action for negligence.

## DISPOSITION

The March 27, 2008 order of dismissal is reversed, and the cause is remanded to the trial court with directions to vacate its minute order of February 26, 2008, to the extent the order sustained Blue Cross's demurrer to the negligence cause of action, and to enter a new order overruling the demurrer to the negligence cause of action. Appellants shall recover their costs on appeal.

Rubin, Acting P. J., and Flier, J., concurred.