[No. B173273. Second Dist., Div. Eight. May 5, 2005.]

MEL WOODS et al., Plaintiffs and Appellants, v.
FOX BROADCASTING SUB., INC., et al., Defendants and Respondents.

COUNSEL

O'Donnell & Shaeffer, Pierce O'Donnell, John Shaeffer and Jodi Swick for Plaintiffs and Appellants.

Quinn Emanuel Urquhart Oliver & Hedges, John B. Quinn, Johanna Y. Ong and Ryan G. Baker for Defendants and Respondents.

OPINION

**RUBIN, Acting P. J.**—Plaintiffs Mel Woods and Stan Golden appeal from the judgment entered in favor of Fox Entertainment Group and other Fox related entities following the entry of orders sustaining without leave to amend demurrers to several of plaintiffs' causes of action. For the reasons set forth below, we reverse the judgment and the order sustaining the demurrers to plaintiffs' four causes of action for interference with contract and prospective economic advantage.

## FACTUAL ALLEGATIONS[1]

In 1995, the News Corporation, Ltd. (News Corporation), and several of its affiliated companies formed Fox Family Worldwide, Inc. (Fox Family) as a joint venture with Haim Saban (Saban). Fox and Saban each owned 49.5 percent of the shares of Fox Family, with the remaining 1 percent held by another entity.[2] Fox Family was an entertainment company whose assets included the Fox Kids Network and other family-oriented television programming. Before Fox Family was formed, plaintiffs Mel Woods and Stan Golden were high-ranking officers or employees of Saban Entertainment, which was owned by Saban. After the formation of Fox Family, Woods became its president, chief operating officer and chief financial officer. Golden remained as president of Saban Entertainment, but was contractually required to work with and report to Fox Family's leadership.[3]

While working for Saban before the creation of Fox Family, appellants "earned" vested "compensatory" stock options in Saban Entertainment. After Fox Family was created, those stock options were made contractual obligations of Fox Family. Most relevant here, if Saban ever sold his shares of Fox

---

[1] In accord with the standard of review, discussed *post*, we set forth the factual allegations of the operative pleadings and, for our purposes, accept them as true.

[2] In addition to News Corporation, the other named defendants who owned shares of Fox Family were Fox Broadcasting Sub., Inc., Fox Broadcasting Company, and Fox Entertainment Group. We will refer to these entities collectively as Fox.

[3] We will sometimes refer to Woods and Golden collectively as appellants.

Family, appellants were required to sell their options in a manner which guaranteed them each 1 percent of the sales price of Saban's Fox Family shares.

In 2001, Saban decided to sell his entire 49.5 percent interest in Fox Family. This eventually resulted in the sale of Saban's and Fox's entire interests in Fox Family to the Walt Disney Co. (Disney) in October 2001. Disney paid $5.3 billion to buy Fox Family. As part of the deal, however, Fox insisted that Disney take on certain of Fox's obligations to carry cable broadcasts of Major League Baseball (MLB) games. Fox did so because the MLB contract had become a losing proposition, with the prospect of future long-term losses of $600 million. Disney initially balked at taking on the MLB obligations, but agreed to do so by paying $400 million less than it would have to buy Fox Family without MLB. The end result was to reduce the amount of appellants' stock option buyout rights by $4 million each. According to appellants, Fox engineered the deal in that manner not just to cut its losses by dumping part of the MLB obligations, but also did so with knowledge of appellants' stock option rights and with the intent to interfere with those rights.

After the deal with Disney was completed, appellants received more than $20 million each, a figure which represented their 1 percent share of the sales price. As part of that transaction, appellants signed a document which stated that the amount received was in accordance with and in full satisfaction of their stock option agreements, and that those agreements were of no further force or effect. According to appellants, they were required to sign the agreement in order to get the money, did so in order to receive the money, and protested the amount of the payment.

## PROCEDURAL HISTORY

Based on the allegations set out above, appellants sued Fox for intentional and negligent interference with contract and with intentional and negligent interference with prospective economic advantage (the interference claims).[4] Their first amended complaint also included causes of action for fraud, negligent misrepresentation, breach of fiduciary duty, an accounting, and for unlawful business practices. (Bus. & Prof. Code, § 17200.)[5] Fox demurred to the interference claims on two grounds: (1) because appellants' contracts did

---

[4] Appellants also allege that Fox reduced the sales value of Fox Family in other ways, such as by recouping loan proceeds that were never paid and by undervaluing Fox Kids Network. Those alleged acts are not asserted as grounds for appellants' interference claims, however.

[5] The action also once included a third plaintiff, Shuki Levy, who was Fox Family's executive for programming and development. According to appellants' brief, Levy dismissed his claims and is no longer a party.

not obligate Fox Family to obtain the highest possible price, and because appellants in fact received their proper share of the purchase price, no interference with their contractual rights occurred; and (2) because Fox owned just under half of Fox Family, it was not a stranger to appellants' contracts with Fox Family and therefore could not, as a matter of law, be liable for interfering with those contracts. Based on the decision in *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514 [28 Cal.Rptr.2d 475, 869 P.2d 454] (*Applied Equipment*), the trial court found that Fox was not a stranger to the contracts and therefore sustained the demurrers to the interference claims without leave to amend.[6]

In response, appellants reasoned that if Fox were not a stranger to the contracts, then it must in some manner be a party to the contracts. Appellants therefore filed a second amended complaint which replaced the four interference claims with causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing. That pleading included the five causes of action for fraud, negligent misrepresentation, breach of fiduciary duty, an accounting, and unlawful business practices that had not been demurred to by Fox. Fox demurred to the two contract claims on the ground that it was not a party to the contracts. Those demurrers were sustained without leave to amend. Appellants then filed a request for dismissal with prejudice of their remaining causes of action, which was followed by the entry of judgment in favor of Fox. On appeal, appellants challenge only the order granting Fox's demurrers to the interference claims.

## STANDARD OF REVIEW

In reviewing a judgment of dismissal after a demurrer is sustained without leave to amend, we must assume the truth of all facts properly pleaded by the plaintiff-appellant. Regardless of the label attached to the cause of action, we must examine the complaint's factual allegations to determine whether they state a cause of action on any available legal theory. (*Black v. Department of Mental Health* (2000) 83 Cal.App.4th 739, 745 [100

---

[6] The trial court also found that no independently wrongful act apart from the interference itself had been alleged, thereby precluding the claims for negligent interference. (*Della Penna v. Toyota Motor Sales, U.S.A., Inc..* (1995) 11 Cal.4th 376 [45 Cal.Rptr.2d 436, 902 P.2d 740] (*Della Pena*). That was not, however, a ground raised in Fox's demurrers. Instead, Fox contended that no interference occurred because appellants had no contractual right to require the sale of Fox Family at the best possible price. Neither party has mentioned this disparity and Fox argues on appeal, as it did below, that appellants failed to allege interference, not that they failed to allege an independently wrongful act. Accordingly, we will not reach the trial court's alternative ground for granting the demurrers. Furthermore, *Della Pena's* independent wrongful act requirement applies to only claims for interference with prospective economic advantage, not to claims for interference with an existing contract. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 51–56 [77 Cal.Rptr.2d 709, 960 P.2d 513].)

Cal.Rptr.2d 39].) The judgment will be affirmed if it is proper on any of the grounds raised in the demurrer, even if the court did not rely on those grounds. (*Pang v. Beverly Hospital, Inc.* (2000) 79 Cal.App.4th 986, 989 [94 Cal.Rptr.2d 643].)

■ We will not, however, assume the truth of contentions, deductions or conclusions of fact or law and may disregard allegations that are contrary to the law or to a fact which may be judicially noticed. When a ground for objection to a complaint, such as the statute of limitations, appears on its face or from matters of which the court may or must take judicial notice, a demurrer on that ground is proper. (Code Civ. Proc., § 430.30, subd. (a); *Black v. Department of Mental Health, supra,* 83 Cal.App.4th at p. 745.) We may take judicial notice of the records of a California court. (Evid. Code, § 452, subd. (d).) We must take judicial notice of the decisional and statutory law of California and the United States. (Evid. Code, § 451, subd. (a).)

## DISCUSSION

### 1. *Fox Can Be Liable for Interference with Appellants' Contract Rights*

■ Our courts recognize four types of claims for interference with contractual rights or expectancies: Intentional or negligent interference with an existing contract and intentional or negligent interference with prospective economic advantage. (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153–1154 [131 Cal.Rptr.2d 29, 63 P.3d 937] [intentional interference with contract and economic advantage]; *North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 786 [69 Cal.Rptr.2d 466] [negligent interference with economic advantage]; *SCEcorp. v. Superior Court* (1992) 3 Cal.App.4th 673, 677 [4 Cal.Rptr.2d 372] [negligent interference with contract].) The elements of those causes of action have been discussed and detailed by many decisions, but only one element common to all four is relevant here: that a party to the plaintiff's contract cannot be liable under any of the four theories. If the defendant is a party to the contract, the plaintiff is relegated to a cause of action for breach of that contract. (*Applied Equipment, supra,* 7 Cal.4th at pp. 513, 517–518.) At one time, even though a contracting party could not be liable on an interference claim, many courts had held that the contracting party could be liable in *tort* for conspiring with a noncontracting party to breach the plaintiff's contract. (See, e.g., *Shapoff v. Scull* (1990) 222 Cal.App.3d 1457, 1465 [272 Cal.Rptr. 480] (*Shapoff*); *Wise v. Southern Pacific Co.* (1963) 223 Cal.App.2d 50, 71–72 [35 Cal.Rptr. 652]; see also *Applied Equipment, supra,* at p. 510, and cases cited therein.) For many years, our courts also held that an interference claim based on the contractual obligation of a business entity could be maintained against the officers, directors, or owners of that entity.

Such defendants could escape liability by resorting to certain privileges, however, which turned on whether they had acted to benefit the business entity in question. (*Collins v. Vickter Manor* (1957) 47 Cal.2d 875, 883 [306 P.2d 783] (*Collins*) [valid cause of action for interference stated against defendants who were officers, directors, and beneficial owners of the contracting company; existence of privilege based on acts in best interests of the corporation was a defense whose resolution turned on factual issues]; *Culcal Stylco v. Vornado, Inc.* (1972) 26 Cal.App.3d 879, 883 [103 Cal.Rptr. 419] (*Culcal*) [parent corporation's interference with subsidiary's contract not privileged as a matter of law by virtue of that relationship]; see Rest.2d Torts, § 769 [actor having financial interest in third person's business does not improperly interfere if he did not employ wrongful means and acted to protect his own interest from being prejudiced].)[7]

The court in *Applied Equipment, supra,* 7 Cal.4th 503, overruled the decisions which held that a party to a contract could be held liable for conspiracy to interfere with the contract. The starting point for the court's analysis was the prohibition against imposing tort liability for contractual interference on a party to the contract. The court noted that conspiracy is not an independent tort. Instead, such liability is premised on the notion that the coconspirator is legally capable of committing some underlying tort which will then serve as the basis for conspiracy liability. Imposing conspiracy liability for interference with a contract on a party to that contract is therefore irreconcilable with the rule excluding contracting parties from liability for contractual interference. (*Id.* at pp. 511, 513–514.)

■ As part of that discussion, the court described the prohibition against liability of contracting parties as follows: "California recognizes a cause of action against *noncontracting parties* who interfere with the performance of a contract. 'It has long been held that *a stranger to a contract* may be liable in tort for intentionally interfering with the performance of the contract.' . . . [¶] However, consistent with its underlying policy of protecting the expectations of contracting parties against frustration *by outsiders* who have no legitimate social or economic interest in the contractual relationship, the tort cause of action for interference with a contract does not lie against a party to the contract. . . ." (*Applied Equipment, supra,* 7 Cal.4th at pp. 513–514, citations & fn. omitted.)

---

[7] The existence of that privilege depends on whether the defendant used improper means and acted to protect the best interests of his own company. (*Culcal, supra,* 26 Cal.App.3d at pp. 881–882.) It is a qualified privilege that turns on the defendant's state of mind, the circumstances of the case, and the defendant's immediate purpose when inducing a breach of contract. (*Id.* at pp. 882–883.) Because any claim of privilege here would not have been apparent from the face of the second amended complaint, Fox did not assert the privilege as a ground for its demurrer. Therefore, as noted *post,* Fox concedes that the privilege issue is not before us.

Fox argued, and the trial court agreed, that this quoted language from *Applied Equipment* meant that not only were contracting parties immune from interference claims, so too were another class of defendants who, although not parties to a contract, were not true "strangers" to the contract because they had some general interest in the contractual relationship. By doing so, the trial court ignored "previous warnings that 'the language of an opinion must be construed in light of the facts of the particular case, an opinion's authority is no broader than its factual setting and the parties cannot rely on a rule announced in a factually dissimilar case.' " (*Finegan v. County of Los Angeles* (2001) 91 Cal.App.4th 1, 9 [109 Cal.Rptr.2d 762].) As set forth below, we conclude that any language in *Applied Equipment* that might be construed as Fox contends is dicta at best.

At issue in *Applied Equipment* was the applicability of tort conspiracy law to hold a contracting party liable for conspiring with a third party who sought to disrupt the contractual relationship. The plaintiff had a contract to supply Litton with certain equipment. Litton was unhappy with the price it was being charged and went directly to the plaintiff's supplier to cut a better deal, reducing the plaintiff's commission as a result. The plaintiff sued Litton for conspiring with the supplier to induce a breach of the contract between the plaintiff and Litton. There was no dispute that Litton was indeed a party to the contract and the court's analysis never considered the immunity of someone who was not a party to the contract. Every decision cited by *Applied Equipment* during the brief discussion that formed the basis of the trial court's ruling in this case is similarly inapplicable. (See *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 24–25 [276 Cal.Rptr. 303, 801 P.2d 1054]; *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 [270 Cal.Rptr. 1, 791 P.2d 587] (*Bear Stearns*); *Kelly v. General Telephone Co.* (1982) 136 Cal.App.3d 278, 288 [186 Cal.Rptr. 184]; *Dryden v. Tri-Valley Growers* (1977) 65 Cal.App.3d 990, 998 [135 Cal.Rptr. 720] (*Dryden*), all cited by *Applied Equipment, supra,* 7 Cal.4th at pp. 513–514.) In each of those cases, it was clear that the defendant was either a contracting party or its agent who could not be liable for interference (*Shoemaker v. Myers, supra,* at p. 24 [corporate agents could not be liable for inducing their employer to breach a contract]; *Kelly v. General Telephone Co., supra,* at p. 288 [business could not be liable for interfering with its own contract through acts of its employees]; *Dryden, supra,* at p. 998 [the defendant was a party to the contract]), or a noncontracting party who might, given the proper allegations, be liable (*Bear Stearns, supra,* at p. 1126 [the defendant was a brokerage company who allegedly interfered with contract between power company and county agency]). None considered the potential liability of noncontracting parties who had some general economic interest or other stake in the contract.

While the court in *Bear Stearns, supra,* 50 Cal.3d at page 1126, used the term "stranger to a contract," none of the decisions cited by *Applied*

*Equipment* used the phrase "outsiders who have no legitimate social or economic interest in the contractual relationship" (*Applied Equipment, supra,* 7 Cal.4th at p. 514, italics omitted) to describe a class of defendants who are immune from liability for interference with contract. The source of that language—which has no apparent connection to the issues before the *Applied Equipment* court or the decisions it cited—is therefore a mystery. Instead of the broad language used in *Applied Equipment,* the *Dryden* court spoke in terms of interference by a "third person," with immunity available to someone who is a "party to the contract." (*Dryden, supra,* 65 Cal.App.3d at pp. 998–999.) When *Applied Equipment* did use the term " 'stranger to a contract,' " it did so interchangeably with the terms "noncontracting parties" (*Applied Equipment, supra,* 7 Cal.4th at pp. 513–514, italics omitted) and "third parties." (*Id.* at pp. 516–517.) When distinguishing interference with contract from other torts, the *Applied Equipment* court also said that the interference tort "cannot be committed by a *contracting party* . . . ." (*Id.* at p. 520, fn. 8, italics added.)

In short, neither *Applied Equipment* nor any of the authorities it relied upon when discussing the liability of third parties arose from factual settings like the one here—where a powerful shareholder allegedly interferes in a contract between the corporation whose shares it owns and some other person or entity. As a consequence, the *Applied Equipment* court had no occasion to discuss the line of cases such as *Collins, supra,* 47 Cal.2d 875, which held that the owners or officers of a business entity could be held liable for interfering with that entity's contracts, subject to the defense of certain privileges.[8] Given this, we find it highly unlikely that *Applied Equipment* intended to hold, or should be construed as holding, that persons or entities with an ownership interest in a corporation are automatically immune from liability for interfering with their corporation's contractual obligations. (See *Webber v. Inland Empire Investments, Inc.* (1999) 74 Cal.App.4th 884, 899–900 [88 Cal.Rptr.2d 594] [noting that even though *Shapoff, supra,* 222 Cal.App.3d 1457, was disapproved in *Allied Equipment* to the extent it approved conspiracy claims for contract interference against parties to a contract, its other holdings remained intact; among these were the rule that owners and managers may be held liable in tort for contract interference when they were not acting to protect the interest of the contracting party].)[9]

---

[8] See footnote 7, *ante.*

[9] Another possible indication that *Applied Equipment*'s "economic interest" language should not be construed as Fox contends comes from that court's discussion of the potential liability of both Litton and the plaintiff's supplier, each of whom had a contract with the plaintiff. Although Litton could not be liable for conspiring with the supplier to breach Litton's contract with the plaintiff, the court said that Litton could still be liable for interfering in the plaintiff's contract with the supplier, while the supplier could be liable for interfering in the plaintiff's contract with Litton. Clearly, both Litton and the supplier had an economic interest in the other's contract, yet their tort liability for interference in those contractual relationships was still considered viable.

Fox points to a handful of decisions, one from California, and two from the federal courts, that it contends have reached the same conclusion Fox asks us to draw here. In *Kasparian v. County of Los Angeles* (1995) 38 Cal.App.4th 242 [45 Cal.Rptr.2d 90], the plaintiff, a limited partner of a partnership, sued the general partnership, two of the individual general partners, and a Los Angeles County supervisor for interfering in settlement negotiations to end a partnership dispute that had ended up in litigation. Not surprisingly, the court relied on *Applied Equipment* and held that the partnership could not be liable for interfering with that prospective economic advantage. But, without discussion or analysis, the court also included the individual partner defendants in that holding. (*Id.* at pp. 262, 266.) Given our analysis of *Applied Equipment*, combined with the absence of any analysis on the issue by the *Kasparian* court, we decline to follow *Kasparian* to the extent it might hold that some of the individual owners of a business entity are automatically deemed to be exempt from contract interference liability because their economic interest in the entity means they are not strangers to any of the entity's contractual obligations.

Fox also relies on *Marin Tug & Barge v. Westport Petroleum* (9th Cir. 2001) 271 F.3d 825 (*Marin Tug*). The plaintiff in that case was a barge operator who sued Shell Oil Company because it believed that Shell sold it contaminated fuel which damaged its engines. The barge operator's customers included businesses who bought fuel oil from Shell. In carrying out those contracts, the barge operator would pick up its customers' supplies from Shell's refinery and deliver them. As a result of the barge operator's suit, Shell no longer allowed the barge company to load fuel at Shell's refinery that the barge company had contracted to deliver to its own customers. The barge company sued Shell for interfering with the barge company's contracts with its own customers. The Ninth Circuit affirmed summary judgment for Shell, primarily on the basis that its refusal to deal with the tug company was not independently wrongful, as required by *Della Pena, supra,* 11 Cal.4th 376. For reasons that are not clear to us, the *Marin Tug* court considered the immunity of an entity with a direct interest or relationship in the contract to be "closely connected" with *Della Pena's* independent wrongfulness test. (*Marin Tug, supra,* at p. 832.) Among the decisions it cited for that proposition were *Della Pena, supra,* at pages 391 to 392, which concerned only the independent wrongfulness requirement, *Hamro v. Shell Oil Co.* (9th Cir. 1982) 674 F.2d 784, 790, which considered whether Shell Oil's alleged contractual interference in the affairs of a company in which Shell held a financial interest was privileged, and *Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672, 1688 [60 Cal.Rptr.2d 195], which was also concerned solely with the independent wrongfulness requirement.

As part of a lengthy discussion detailing why Shell's refusal to deal with the barge company was not independently wrongful, and with no mention of

*Applied Equipment,* the Ninth Circuit said that even though some of the contracts were between the barge company and its customers, those contracts "required direct, active involvement by Shell—the loading of Shell oil onto Marin Tug's barges. Because the economic relationship between Marin Tug and the buyer of any Shell oil shipped on Marin Tug's barges depends on Shell's cooperation, Shell is not easily characterized as a stranger to that relationship. Further, as the underlying dispute that gave rise to this lawsuit demonstrates, Shell and Marin Tug had a mutual economic interest in delivering the oil safely and cleanly, and were dependent upon each other to do so. . . ." (*Marin Tug, supra,* 271 F.3d at p. 834.)

Based on this language, Fox asks us to conclude that its "version" of *Applied Equipment's* holding—an ownership interest in a business entity's contract confers immunity from tort liability for interfering with the entity's contracts—can be stretched so far that it now protects a defendant who has no more than an economic interest or connection to the plaintiff's contract with some other entity. As with *Applied Equipment,* we believe Fox reads too much into *Marin Tug.* In *Marin Tug,* the Ninth Circuit was primarily focused on the "independent wrongfulness" element of a California tort claim for interference with prospective economic advantage under *Della Penna.* (*Marin Tug, supra,* 271 F.3d at pp. 832–834.) The court observed that whether a defendant's improper motives satisfied the "independent wrongfulness" test had not been resolved by the California state courts and therefore it entered that area of law with "trepidation." (*Id.* at pp. 831–832.) In this context, it appears that the Ninth Circuit was unsure whether malice might suffice as an element of the prima facie tort, or was instead a component of the qualified privilege defense available to interested persons who act nonmaliciously on behalf of the breaching party. (See *Collins, supra,* 47 Cal.2d at p. 883; *Culcal, supra,* 26 Cal.App.3d at p. 883; Rest.2d Torts, § 769.) The Ninth Circuit's focus was therefore on the wrongfulness of Shell's refusal to deal with the barge operator, and it evaluated the nature of Shell's relationship with the barge company and the barge company's customers in that light. There is no mention of *Applied Equipment* and, as noted above, the three decisions cited by *Marin Tug* for the immunity of those with a direct interest in someone else's contractual relationship in fact have no bearing on that issue. As a result, we conclude that *Marin Tug* did no more than evaluate the wrongfulness of Shell's conduct in the context of its relationships with Marin Tug and the tug company's customers and was not extending immunity from contract interference claims to an even broader, more attenuated class of persons.[10]

---

[10] Further proof that *Marin Tug* does not set some new standard of immunity for contract interference claims comes from *Applied Equipment* itself. As discussed in footnote 9, *ante,* the *Applied Equipment* court said that even though Litton could not be liable for conspiring to interfere with its own contract with the plaintiff, both Litton and the supplier could be liable

■ To sum up, since long before *Applied Equipment* was decided, our courts have allowed contract interference claims to be stated against owners, officers, and directors of the company whose contract was the subject of the litigation. While those defendants may attempt to prove that their conduct was privileged or justified, that is a defense which must be pleaded and proved. Although Fox contends that its conduct will meet those standards, it also concedes that the privilege issue is not properly before us on demurrer. As a result, we hold that the trial court erred in sustaining the demurrer on the ground that Fox was not a stranger to appellants' contracts.[11]

### 2. Appellants Alleged Fox's Interference with an Implied Contractual Right

■ An essential element of a contract interference claim is proof that the defendant's conduct actually disrupted or breached the plaintiff's contract. (*Korea Supply Co. v. Lockheed Martin Co., supra,* 29 Cal.4th at p. 1153 [interference with prospective economic advantage]; *Applied Equipment, supra,* 7 Cal.4th at p. 514, fn. 5 [intentional interference with contract].) According to Fox, appellants failed to satisfy this requirement because their allegations did not show any contractual right to require the sale of Fox Family at the highest possible price. Because appellants alleged receipt of their 1 percent shares of the purchase price, the complaint shows that no contractual interference occurred.

■ While the contracts are silent on the point, and while a business might be afforded significant latitude as to the terms of the sale of its assets, we do not believe that such discretion is unlimited and unfettered. Appellants bargained for and received certain contractual rights to recoup a percentage of the sales proceeds of Fox Family. Given the proper factual setting, we do not believe that Fox Family has unlimited discretion to intentionally act to defeat or diminish those rights by rigging the sale terms in a way that would hold down the sales price. Such conduct, if properly alleged and proven, could well violate the implied covenant of good faith and fair dealing. (*Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 803–804 [48 Cal.Rptr.2d 747] [implied covenant might apply to rein in otherwise unlimited discretion of a contracting party in order to prevent conduct which would render the

---

for interfering with, respectively, plaintiff's contract with the supplier and plaintiff's contract with Litton. As in *Marin Tug,* Litton and the supplier had a clear involvement and mutual economic interest in those contracts. Despite that connection, the *Applied Equipment* court believed that the alleged interference could be actionable.

[11] One final decision cited by Fox is *National Rural Telecomm. Co-Op. v. DIRECTV* (C.D. Cal. 2003) 319 F.Supp.2d 1059, where the court construed *Applied Equipment* as barring contract interference claims against third party beneficiaries to a contract. (*Id.* at pp. 1072–1073.) The court in that case also failed to properly analyze *Applied Equipment.* Even if its analysis were correct, however, its holding concerning third party beneficiaries does not apply to the liability of a shareholder for interfering with its corporation's contracts.

other party's rights meaningless].) If Fox Family could intentionally be sold well below its true market value in order to reduce the amount of appellants' stock option buyout, then their implied contractual right to receive a fair price would be violated. (See *Efron v. Kalmanovitz* (1964) 226 Cal.App.2d 546, 556–558 [38 Cal.Rptr. 148] [minority shareholders are entitled to have sale of corporate assets on terms that are fair to the corporation].) Because appellants alleged that Fox's conduct caused this precise result, they have sufficiently alleged a disruption or breach of their contractual rights.

### 3. *The Purported Releases by Appellants*

█ Appellants alleged that in order to receive payment of their undisputed share of the sales proceeds, they were required to sign a document which said they had been paid in full pursuant to the terms of their stock option agreements. Although Fox mentioned those allegations in passing as part of its summary of the allegations of the first amended complaint, Fox did not raise the releases as a ground for its demurrers. Apparently acting out of caution, appellants addressed the effect of those agreements in their opposition, contending that they were unlawful under Labor Code section 206.5, which precludes an employer from requiring an employee to sign a release as a condition to receiving payment of wages owed. The trial court did not reach this issue, but Fox asks us to rule on it now, contending that the stock option rights were not wages, meaning that the releases were valid and enforceable. We can reach a ground for demurrer that was not raised below if it presents a pure question of law. (*Home Ins. Co. v. Zurich Ins. Co.* (2002) 96 Cal.App.4th 17, 22 [116 Cal.Rptr.2d 583].) Appellants alleged that their stock options were "compensatory" options which they had "earned." █ In California, "wages" are broadly defined to include more than just salary. (Lab. Code, § 200, subd. (a); *Department of Industrial Relations v. UI Video Stores, Inc.* (1997) 55 Cal.App.4th 1084, 1091 [64 Cal.Rptr.2d 457] [wages includes not just salary but also other benefits that are part of an employee's compensation].) Although the Ninth Circuit has held that stock options are not wages under California law (*International Business Machines Corp. v. Bajorek* (9th Cir. 1999) 191 F.3d 1033, 1039), that case turned on the unpredictability of the stock price at any given time and the inability to determine their relationship to the defendant's labor. Without deciding whether the Ninth Circuit was correct, appellants' allegations that they "earned" their "compensatory" options raises factual issues concerning the reasons why they were awarded and the methods by which they were determined. As a result, it is not appropriate for us to reach that issue now.

## DISPOSITION

For the reasons set forth above, the judgment is reversed, along with the order sustaining the demurrers to the four interference causes of action in the first amended complaint. Appellants to recover their costs on appeal.

Boland, J., and Flier, J., concurred.

Respondents' petition for review by the Supreme Court was denied August 24, 2005. Baxter, J., and Chin, J., were of the opinion that the petition should be granted.