Filed 12/13/13  Mongoose Capital v. Radin CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MONGOOSE CAPITAL, INC.,<br><br>            Plaintiff and Appellant,<br><br>v.<br><br>PETER J. RADIN, JR.,<br><br>            Defendant and Appellant. | A135644<br><br>(Alameda County<br>Super. Ct. No. RG06289441) |

        Following a bench trial, the court entered judgment for plaintiff Mongoose Capital, Inc. (Mongoose) against defendant Peter J. Radin, Jr. (Radin) for $72,629.52, including $54,100 in punitive damages.  This judgment has prompted appeals by both parties along very familiar lines:  Radin contends the trial court awarded too much; Mongoose claims it awarded too little.  We reject Radin's claim that there was no basis for the trial court to conclude that he had interfered with Mongoose's contractual relationship.  We conclude that Mongoose was not entitled to a greater recovery because of the remedy it elected to pursue.  We also conclude, however, that Radin is entitled to credit for a $60,000 settlement by a joint tortfeasor, but that he cannot use that credit to erase the entire judgment.  We will modify the judgment to reflect the credit, and affirm the judgment as so modified.

## BACKGROUND

        This dispute originated with a construction loan that was to be used for remodeling an Oakland property.  The transaction became vastly complicated.  Fortunately, we have the trial court's exhaustively thorough 39-page *first* statement of decision (there were

1

two), and briefs from the parties that are models of accurate and dispassionate narrative. Aided by these sources, we can distill the salient details of the dispute to the following[1]:

Menlo Park I, LLC (MP-1) borrowed $575,000, secured by a promissory note and deed of trust, from United States Dairy Products (USDP) to develop a property in Oakland. As memorialized in their "Participation Agreement Construction Loan," Mongoose provided $100,000 of the $575,000, and agreed to service the note as USDP's agent. Shortly thereafter, USDP sold the entire loan obligation to Regency Acquisitions, LLC (Regency). MP-1 then defaulted.

Radin's presence permeated the transaction. The trial court described him as follows: "[A]n attorney who has been licensed for more than 20 years. Radin served as an agent for Robert Trafton, Inc., USDP's managing general partner. Radin, either directly or indirectly, through various family trusts and other vehicles, owned interests in other defendants or key players. Radin acted individually and as agent for those trusts." Specifically, and among other things, Radin: (1) participated in the negotiation of the $575,000 loan and executed the appropriate documents on USDP's behalf; (2) personally provided $50,000 of the loan; (3) provided $112,500 from a limited partnership of which he was the general partner; (4) apparently provided an additional $115,000 from "an entity of which Radin is an 'indirect equity partner' "; (5) "delivered the original Menlo Park Note and Deed of Trust to Mongoose"; (6) as USDP's agent, modified the interest rate on the note without bothering to advise Mongoose or get its consent; (7) executed on USDP's behalf the sale to Regency (which was owned by a "longtime friend") without disclosing that Mongoose had a participation interest, and again without notifying Mongoose or securing its consent; (8) "made the decision to sell the interests of Mongoose in the Menlo Park Note"; and (9) initiated default and foreclosure proceedings against the property owner (which seems to have been how Mongoose learned of the resale of the obligation to Regency).

---

[1] All ensuing quotes in this part of our opinion are, unless otherwise indicated, taken from this statement of decision.

In December 2005, the property owner sued USDP, its managing general partner Robert Trafton, Inc. (Trafton), Regency, and others. The matter settled in May of 2006, when "USDP and Radin-related entities paid $192,000 of the settlement amount, and . . . an entity controlled by Radin's wife[] paid $300,000 of the settlement funds. Other entities also contributed to the . . .total settlement," which was $1 million. That same month, Regency and USDP "modified the terms" of the their agreement. Regency executed a new promissory note for $660,000 that "was unsecured and not guaranteed." Approximately $200,000 for purchase of payments were made on the note, all of which went to the "entity of which Radin is an 'indirect equity owner.' "

In October 2006, MP-1 refinanced the terms of the original promissory note. Regency received $345,000 from the refinance, and "reconveyed" a deed of trust to MP-1. "A portion of the proceeds went to pay off one of the loan participants," i.e., the "entity of which Radin is an 'indirect equity partner.' "

In September 2006, Mongoose sued USDP, Regency, and Radin for breach of contract, fraud, and injunctive relief to halt a pending trustee's sale. In January 2007, shortly after filing its second amended complaint which added MP-1 as a defendant, Mongoose recorded a lis pendens. The lis pendens was expunged—so that the Oakland property could be sold—when MP-1 posted a surety bond of $185,000.

At the request of USDP and Radin, the matter was stayed for a private arbitration of Mongoose's claims against USDP only. In March 2008, the arbitrator's award in favor of Mongoose was confirmed and entered as a judgment for $141,958.90 against USDP.[2]

---

[2] In his award, the arbitrator calculated this sum as "One Hundred Thousand Dollars . . . being the amount paid by [Mongoose] . . . for its interest in the promissory note, together with simple interest thereon . . . being $41,958.90." The arbitrator excoriated USDP for an "egregious breach" of its agreement with Mongoose, and also because USDP "stole [Mongoose's] interest in the note and sold it, deceived [Mongoose] not only regarding the sale but for several months after the sale occurred." These words were quoted by the trial court in its statement of decision, but they are almost an encomium when compared to the blistering language used by the trial court to characterize Radin and his conduct.

The stay lifted, the matter proceeded to trial, and was tried in two phases. The first, which generated the extraordinary statement of decision mentioned earlier, was held in July 2010, and concerned Mongoose's claims against Radin and MP-1.[3] The trial court determined that Radin was liable for $138,900 of principal and accrued interest, plus $18,529.52 of attorney fees. MP-1 was held liable for $213,715.73 in principal and accrued interest. The court deferred to the second phase the determination of the amount of punitive damages for which Radin would be liable. Also deferred was the allocation of a $60,000 settlement by a former defendant.

The second phase entailed no presentation of evidence, but was decided on trial briefs and argument. The court determined that Radin would be assessed punitive damages of $54,100.

Mongoose submitted a proposed judgment that would award it its principal investment of $100,000, interest of more than $128,000, and attorney fees from MP-1, together with $100,000 principal, $38,900 interest, $18,529.52 for attorney fees, and $54,100 punitive damages from Radin. USDP and Radin had several problems with the scope of recovery Mongoose was claiming: "The time has finally come for Mongoose to elect its remedy: either a judgment for judicial foreclosure against MP-1 *or* a judgment for damages against Radin . . . . [¶] Should Mongoose choose to pursue a remedy for damages against Radin, the Court should not award damages in the amount proposed by Mongoose. Because contract damages against Radin are not available, and because Radin is not jointly and severally responsible for MP-1's obligation, the Proposed Judgment proffered by Mongoose should be rejected by the Court. Instead, the Proposed Judgment should be modified to reflect the actual damages sustained by Mongoose as a result of the interference specified by the Court. [¶] The Proposed Judgment should also be rejected or modified because it fails to properly account for any set offs and credits" for "settlement proceeds."

---

[3] A default had already been entered against Regency. The statement of decision recites that "the trial is serving as a prove-up hearing against that entity." Ultimately, no damages were assessed against Regency.

4

The trial court apparently found these objections persuasive because the judgment subsequently entered provided as follows:

"The Court has determined that plaintiff Mongoose . . . has a viable security interest in the MP-1 Note. The Court finds that plaintiff must elect a remedy, and further finds that plaintiff has stated its election to pursue the security interest it has in the MP-1 note by seeking to collect on the Surety Bond to Expunge Lis Pendens . . . in post-judgment proceedings . . . . Based upon plaintiff's election, the Court finds as follows:.

"IT IS HEREBY ORDERED, ADJUDICATED AND DECREED that plaintiff may recover $18,529.52 in compensatory damages, and $54,100 in punitive damages from defendant Peter M. Radin, Jr. . . . Radin's obligations in this regard are deemed several.[4]

"IT IS FURTHER ORDERED, ADJUDICATED AND DECREED that plaintiff shall recover from defendant Menlo Park 1 . . . the following amounts: $100,000 representing principal; $131,084.16 from March 28, 2012, representing accrued interest; the daily amount of $54.79 per day through March 28, 2012 until the date of entry of this judgment; late charges in the amount of $525.00; and, attorneys fees and statutory costs in an amount to be determined . . . .[5]

"IT IS FURTHER ORDERED, ADJUDICATED AND DECREED that the amounts to be recovered by plaintiff against MP-1, as specified above, be set off and

---

[4] The $18,529.52 designated as compensatory damages is the identical figure used by Mongoose in its proposed judgment and allotted "for attorneys' fees." Although not common, " 'Under California law, it is a well-established principle that attorney fees incurred through instituting or defending an action as a direct result of the tort of another are recoverable damages.' " (*Third Eye Blind, Inc. v. Near North Entertainment Ins. Services, LLC* (2005) 127 Cal.App.4th 1311, 1324-1325.)

[5] In December 2012, the court made an "Order . . . Enforcing Liability On Undertaking," concluding that, because Mongoose's total damages—including a postjudgment award of attorney fees of more than $161,000 assessed against MP-1—totaled $336,846.78 "plus any accrued interest" and thus exceeded the amount of the bond, Mongoose was entitled to recover the entire $185,000 value of the bond, MP-1 and Regency being jointly and severally liable.

5

reduced by $60,000, representing the amount in settlement funds paid by defendant George Cresson, the credit to be applied in the following order: (1) attorney fees (2) costs (3) interest and (4) principal."

Timely notices of appeal were filed by Radin, and then by Mongoose.

## REVIEW

### The Parties' Contentions

Radin first argues that he should not be liable at all because he was erroneously found to have interfered with the Mongoose-MP-1 contract. If that fails, Radin argues that the trial court erred in not allowing an offset to the damage award against him for the $60,000 paid by another defendant to settle Mongoose's claims. He believes that sum is more than enough to obliterate the $18,529.52 of compensatory damages, which would then erase the $54,100 of punitive damages. Mongoose asserts that the trial court failed to award it all the damages to which it was entitled by Civil Code section 3333[6] for Radin's interference with its contract.

We will address the parties' contentions in the most logical order. Because it is the common element of both sides' arguments, we initially examine the trial court's decision that Radin was liable for intentionally interfering with Mongoose's contract with MP-1.

### What The Trial Court Found

Radin states on the first page of his brief that he "does not challenge the factual findings made by the trial court." This will be treated as a binding admission. (*Mangini v. Aerojet-General Corp*. (1996) 12 Cal.4th 1087, 1097-1098; *Franklin v. Appel* (1992) 8 Cal.App.4th 875, 893, fn. 11.) Mongoose is not quite so plain-spoken, but its

---

[6] Which provides: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." (Civ. Code § 3333.)

6

brief appears to adopt the same stance.  In light of this mutual acceptance, the trial court's analysis will be quoted, and treated, as factually dispositive.

Under the heading "Mongoose has proved its fifth and ninth causes of action against Radin for intentional interference with contract," the trial court concluded:

" 'The tort of intentional interference with contractual relations is committed only by "strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance." [Citation omitted.]  Consequently, a contracting party is incapable of interfering with the performance of his or her own contract and cannot be held liable in tort for conspiracy to interfere with his or her own contract.  [Citation omitted.]'  (*PM Group, Inc. v. Stewart* (1997) 154 Cal.App.4th 55, 65.)  As explained below, Radin's liability for this claim is not derivative . . . .

"While it is true that Radin acted on behalf of USDP in selling the Menlo Park Note to Regency Acquisitions, Radin donned at least two other of his many hats following the execution of the Participation Agreement and following the sale of USDP's interest in the note.  One hat Radin wore was that of directing the managing agents of Regency Acquisitions to take certain actions to foreclose on the Menlo Park Note and to engage in other questionable, if not outright illegal, activities.  Radin was in actual, even if not nominal, control of Regency Acquisitions.  A second and similar hat was that of being a person in actual, if not nominal control, of Regency Builders.  Neither Regency Acquisitions nor Regency Builders were parties to Mongoose's Participation Agreement.  By wearing those two separate and distinct hats, Radin became a stranger to the . . . Participation Agreement between USDP and Mongoose, and [to] the Menlo Park Note. . . .

"On November 7, 2005, USDP, acting through Radin, sold to Regency all of its interest in the Menlo Park Note, and purported to sell all of the interests of the other participants in the Menlo Park Note.  USDP thus no longer had any further interest in the Menlo Park Note, although it did retain an interest in the Participation Agreement.  Consequently, Radin's actions and conduct in December 2005, in initiating foreclosure proceedings by directing that a notice of default be recorded, and by employing Standard

7

Trust Deed to foreclose, after USDP no longer had an interest in the Menlo Park Note, could not possibly be said to have been undertaken as an agent of USDP. On the contrary, in December 2005, Radin was a mere interloper, with no legitimate interest in the performance of the Menlo Park Note. And to the extent Radin acted through Regency Acquisitions and/or Regency Builders, Radin was a stranger to the Participation Agreement.

"The elements necessary to state a cause of action for intentional interference with contractual relations are '(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; and (5) resulting damage.' (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126.) . . . As applied to this case, Radin's independent and non-derivative liability is clearly established.

"The Court finds that both the Participation Agreement between Mongoose and USDP, and the Menlo Park note, are the operative contracts . . . . The Court further finds that Radin knew of the Participation Agreement and Mongoose's interest in the Menlo Park note and of Mongoose's right to service the loan. The Court further finds that Radin intended to and did disrupt the performance of the Participation Agreement by instituting foreclosure proceedings, and finally, by reconveying the Menlo Park Note and deed of trust through Regency Builders, after falsely representing that the note had been fully repaid. The reconveyance alone intentionally and unquestionably prevented performance of the contracts. Radin himself testified that the reconveyance destroyed Mongoose's security interest.

"Mongoose clearly was financially harmed, and Radin's actions were a substantial factor in causing that harm. Radin's directed activities, particularly in permitting nonjudicial foreclosure proceedings to be commenced, resulted in the outright theft of Mongoose's investment, and caused Mongoose financial harm because Mongoose had to hire attorneys to stop the foreclosure action. The conduct also laid the groundwork for the ultimate fraudulent reconveyance of the Menlo Park Note, which was designed to and

8

would have destroyed Mongoose's security in the note, but for this lawsuit. Thus, the Court rejects Radin's claim that only an attempted interference has been shown.

"Such independently wrongful conduct, which cannot be condoned, provides a basis for a finding of liability on these causes of action. As a result of this conduct, Mongoose lost its $100,000 investment, and any interest it could have earned on this money. Mongoose is therefore entitled to judgment against Radin on the fifth cause of action for intentional interference with contract." And the court further found that that "Radin was not acting on behalf of USDP when he committed this tort." Moreover, "[t]he Court finds that Radin engaged in this conduct with malice, oppression and/or fraud, thus entitling Mongoose to . . . punitive damages."

Mention has already been made that the trial court entertained a very low opinion of Radin's probity and credibility. (See fn. 2, *ante*.) The expression of that opinion is also pertinent to Radin's liability. The trial court colorfully—and accurately—called Radin "a master puppeteer, making George Cresson, Noel Knight [successively the managing partners of MP-1], Mark Hill [the owner of Regency] and others dance to his merry music, obey his whims, and defraud others. Cresson and Knight testified that they did nothing unless directed to do so by Radin. Radin wore many hats throughout all relevant times, hiding behind one or the other when it suited his fancy. It was those many hats that has done him in, because he has lost the ability to claim that he was at all times acting as the agent of USDP."

Against that background, we turn to the parties' contentions, in the reorganized order we believe most conducive to comprehension.

### Radin Was Not Immune From Liability

Radin argues that "the trial court fail[ed] to acknowledge Radin's immunity from liability for interference with his principal's contract." He begins with the principle that "The tort of intentional interference with contractual relations is committed only by 'strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance.' (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd*. (1994) 7 Cal.4th 503, 514.) Consequently, a contracting party is incapable of interfering with

9

the performance of his or her own contract." (*PM Group, Inc. v. Stewart* (2007) 154 Cal.App.4th 55, 65.) He then adds the tenet that "It is also well established that corporate agents and employees acting for and on behalf of a corporation cannot be held liable for a breach of his corporation's contract." (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 24.) Thus, Radin reasons, because he acted on behalf of Trafton, USDP's managing general partner, damages against him were logically and legally impossible.

Trafton obviously qualifies as a corporation, but it was not a party to the Participation Agreement between USDP and Mongoose. It merely acted on behalf of USDP, which was a partnership, not a corporation. The trial court did not describe Radin as an officer or director of Trafton, merely its "agent." Thus, as to the contract between Mongoose and USDP, Radin was a non-party, situated at least two levels from the actual contracting parties. Radin was, therefore, indeed only a "stranger" and "interloper" to that contract.[7]

There is also this finding by the trial court: "Radin's actions and conduct in December 2005, in initiating foreclosure proceedings by directing that a notice of default be recorded, and by employing Standard Trust Deed to foreclose, after USDP no longer had an interest in the Menlo Park Note, could not possibly have been undertaken as an agent of USDP." This finding clearly views Radin as an interloping stranger.

Moreover, even the general rule of immunity is subject to an important proviso: "For many years, our courts also held that an interference claim based on the contractual obligation of a business entity could be maintained against the officers, directors, or owners of that entity. Such defendants could escape liability by resorting to certain privileges, however, which turned on whether they had acted to benefit the business entity in question. (*Collins v. Vickter Manor* (1957) 47 Cal.2d 875, 883 [valid cause of

---

[7] Even so, it might be an overstatement to say that Radin had " 'no . . . interest in the scope or course of the contract's performance,' " because, as the dominant actor in both USDP and Trafton, he may well have had "some general economic interest or other stake in the contract." (*Woods v. Fox Broadcasting Sub., Inc*. (2005) 129 Cal.App.4th 344, 352 (*Woods*).)

action for interference stated against officers who were officers, directors, and beneficial owners of the contracting company . . . .] . . .)" (*Woods*, *supra*, 129 Cal.App.4th 344, 350-351.)

What the *Woods* court concluded seems strikingly germane to our situation: "[N]either *Applied Equipment* nor any of the authorities it relied upon when discussing the liability of third parties arose from factual settings like the one here—where a powerful shareholder . . . interferes in a contract between the corporation whose shares it owns and some other person or entity. As a consequence, the *Applied Equipment* court had no occasion to discuss the line of cases such as *Collins*, *supra*, 47 Cal.2d 875, which held that the owners or officers of a business entity could be held liable for interfering with that entity's contracts . . . . Given this, we find it highly unlikely that *Applied Equipment* intended to hold, or should be construed as holding, that persons or entities with an ownership interest in a corporation are automatically immune from liability for interfering with their corporation's contractual obligations." (*Woods*, *supra*, 129 Cal.App.4th 344, 353, fn. omitted.) Here, Radin obviously played the role of the "powerful shareholder" in his cavalier disregard for existing relationships, other parties' rights, and minimal norms of business propriety.

The trial court clearly believed that Radin's actions were not privileged, excused, or ratified, nor did they benefit USDP or Trafton. Its determination that Radin had acted toward Mongoose with the mental state justifying punitive damages is, by itself, virtually conclusive to separate Radin from USDP or Trafton. The court treated Radin's actions and conduct as motivated by personal concerns, hence the findings that Radin "has lost the ability to claim that he was at all times acting as the agent of USDP," and the express finding that "Radin was not acting on behalf of USDP when he committed this tort." And this is in addition to the finding just quoted concerning Radin's initiation of foreclosure proceedings.

The record is replete with numerous proofs of Radin's disloyalty. His self-dealing and duplicity has already cost USDP the $141,000 for the arbitration award, close to $200,000 to settle with the property owner, and up to $185,000 on the bond. By no

stretch of the imagination can Radin's manipulations and machinations be deemed undertaken with the best interests of USDP or Trafton in mind.  (*Collins v. Vickter Manor*, *supra*, 47 Cal.2d 875, 883; *Woods*, *supra*,129 Cal.App.4th 344, 351.)

The trial court's determination that Radin interfered with the Mongoose-MP-1 contract is legally sound, has the support of abundant evidence, and will not be overturned.

### Mongoose Cannot Increase Radin's Liability

Mongoose contends:  "Originally, the trial court in its Statement of Decision found that Radin would be liable for the loss of the principal amount of the Menlo promissory note, interest thereon and attorney fees under the third party tort doctrine for the fees incurred by Mongoose to contest the foreclosure proceedings.  However, in conjunction with formal issuance of the final judgment against Radin, the trial court changed its position and refused to award Mongoose damages for the losses related to the Menlo promissory note.  Coupled with the fact that its original determination of damages was too low, its further limitation of damages compounded its error."  Although Mongoose is not altogether explicit in its brief, it seems to peg its proper recovery to $100,000 for the loan principal, plus at least $113,000 interest on the principal, and attorney fees and costs of $105,147.62.  These sums are obviously far in excess of the $18,529.52 in compensatory damages actually awarded.  But, however unsympathetic a party Radin may be, Mongoose cannot prevail with this argument on this appeal.

The clear import of Mongoose's contention is that it was not awarded adequate damages.  Yet, as recited in the judgment, the amounts of damages awarded against Radin were the result of Mongoose's election of remedies.  In a different order, the trial court explained:  "Now that the Court has determined that Plaintiff has a viable security interest in the MP-1 Note, Plaintiff must elect which course it wishes to pursue.  Plaintiff cannot secure the same $100,000 principal amount, plus interest, late fees and costs, from USDP, MP-1, and Radin.  [¶] Plaintiff stated its election to pursue the security interest it has in the MP-1 Note by seeking to collect on the bond that was given as substitute for the security."  One of the purposes of requiring a party to elect remedies is to prevent

12

windfall multiple recoveries for the same injury.  (E.g., *Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541, 573-574; *City of Moorpark v. Superior Court* (1998) 18 Cal.4th 1143, 1161; *Busick v. Workmen's Comp. Appeals Bd.* (1972) 7 Cal.3d 967, 974.)  Once made, the election is ordinarily binding.  (*Akin v. Certain Underwriters at Lloyd's London* (2006) 140 Cal.App.4th 291, 296.)  Mongoose will not on this appeal be allowed to repudiate its election in an obvious attempt to secure a multiple recovery.

## The Trial Court Erred In Not Allowing An Offset For the Amount Of A Prior Settlement

One of the defendants added by Mongoose in its second amended complaint was George V. Cresson, III, who was the managing partner of MP-1 until he withdrew from that position sometime prior to the October 2006 refinancing and the "reconveyance" to MP-1.  Cresson settled with Mongoose for $60,000.  Cresson and Mongoose agreed in their written settlement agreement that this sum "shall be applied against attorney's fees previously incurred by Mongoose." The court granted Mongoose's unopposed motion to have this settlement determined to be in good faith. As reflected in the judgment quoted above, the trial court allowed this amount to be set off to reduce MP-1's contractual liability to Mongoose.  On the premise that he and Cresson were joint tortfeasors, Radin contends that Code of Civil Procedure sections 877 and 877.6[8] require that this amount should have been credited to him to reduce his tort liability to Mongoose.

Mongoose advances two opposing arguments.  First, it sees the issue as waived because Radin did not raise it when the good faith of the Cresson settlement was

---

[8] "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, . . . it shall . . . [¶] . . . reduce the claims against the others . . . in the amount of the consideration . . . ."  (Code Civ. Proc., § 877, subd. (a).)

"Any party to an action in which it is alleged that two or more parties are joint tortfeasors . . . shall be entitled to a hearing on the issue of the good faith of the settlement entered into by the plaintiff . . . and one or more alleged tortfeasors . . . ."  (Code Civ. Proc., § 877.6, subd. (a)(1).)

13

submitted for the trial court's determination. Second, Mongoose asserts that the premise of Radin's contention is faulty because Radin and Cresson were not joint tortfeasors.

The trial court refused to allow the offset on what appears to have a forfeiture theory: "[T]he Court agrees with Mongoose that the funds should be allocated as provided for in the Cresson settlement agreement. The Court rejects Radin's allegation that he should be credited with some or all of the settlement funds because he and Cresson were alleged to be joint tortfeasors as to the interference with contract claims. Radin was aware of the proposed allocation of the settlement . . . when the application for determination of good faith settlement was made, and did not object to that allocation. The Court believes that the allocation was fair when proposed and approved, and Radin will not be heard to object at this juncture." This reasoning was faulty.

Once a settlement between plaintiff and tortfeasor is judicially determined to be in good faith, "nonsettling tortfeasors are entitled to a credit *in the amount paid by the settling tortfeasor*." (*Leung v. Verdugo Hills Hospital* (2012) 55 Cal.4th 291, 303; italics added; accord, e.g., *Wade v. Schrader* (2008) 168 Cal.App.4th 1039, 1046-1047 [nonsettling defendants are "entitled, as a matter of right," "as a matter of law," and "by operation of law" to reduce their liability by the amount of pretrial good faith settlements].) "[O]ne of the purposes of the setoff requirement . . . is to avoid an unjust double recovery," and another is "to ensure an equitable apportionment of liability among tortfeasors." (*Bostick v. Flex Equipment Co., Inc*. (2007) 147 Cal.App.4th 80, 111.) Concepts of waiver, estoppel, and invited error do not apply. (See *Hartford Accident & Indemnity Co. v. Superior Court* (1995) 37 Cal.App.4th 1174, 1182-1184.) We have treated the offset as mandatory. (*Newby v. Vroman* (1992) 11 Cal.App.4th 283, 288.)

Mongoose's waiver argument is not persuasive. The one decision it cites, *El Escorial Owners' Assn. v. DLC Plastering, Inc*. (2007) 154 Cal.App.4th 1337, does invoke the principle that " ' "An appellate court will ordinarily not consider procedural defects or erroneous rulings . . . where an objection could have been, but was not . . . presented . . . .," ' " but it does so within the context of the appellant trying to challenge the determination that a settlement was made in good faith. (*Id*. at pp. 1362-1364.) That

is not Radin's objective here, and his contention presumes that the Cresson-Mongoose settlement was a good faith one. Moreover, the cited decision notes the credit entitlement just mentioned (*id*. at p. 1353), as does *Knox v. County of Los Angeles* (1980) 109 Cal.App.3d 825, 836, another decision cited by Mongoose. But Mongoose is unable to produce precedent directly holding that a nonsettling defendant forfeits entitlement to reduction by failing to challenge whether the settlement that would create the credit was the product of good faith.

Finally, it does not appear that Radin failed to bring the matter to the court's attention in a timely matter. The record produced by the parties in their respective appendices does not include their trial briefs, if such were submitted. But the record does establish that Radin repeatedly argued for the $60,000 credit while the first statement of decision was being composed. By contrast, there is nothing in the record establishing that Mongoose questioned Radin's status as Cresson's joint tortfeasor prior to entry of the judgment. Mongoose is thus defeated by the very same principle it tries to use against Radin. (*El Escorial Owners' Assn. v. DLC Plastering, Inc*., *supra*, 154 Cal.App.4th 1337, 1363.)

Mongoose states in its brief: "Radin contends that he is entitled to a credit for the Cresson settlement, because he and Cresson were, allegedly, joint tortfeasors. However, the evidence at trial does not support this contention. The evidence (and the trial court's findings to which Radin does not object) demonstrates that Radin was directing all activities which acted to interfere with Mongoose's rights." This may be conceded, but it does not exclude participation by Cresson. On this point it is useful to consider this finding by the trial court: "In March 2005, George V. Cresson, III, MP-1's manager [managing partner], and Radin, on behalf of USDP, through its managing general partner, Robert Trafton, Inc., modified the Menlo Park Note to change the interest rate from daily compounding to simple interest." This finding clearly treats Cresson and Radin as both involved in the modification. Insofar as this act was wrongful, it would be sufficient to establish Cresson and Radin as joint tortfeasors. The fact that Cresson had subsequently resigned as MP-1's managing partner by the time Radin directed initiation of the

15

foreclosure proceedings, which is the foundation of Mongoose's argument, would therefore not be dispositive.

It only remains to determine whether the credit is to made in a manner that will absolve Radin from any and all liability.

### Radin Is Not Entitled To Complete Financial Exoneration

Not content with getting the $60,000 offset, Radin advances a creative approach for using it to obliterate the $72,629.52 judgment against him. He argues that the offset is far greater than the compensatory damages of $18,529.52 and, with no compensatory damages, there can be no punitive damages as a matter of law. (See *Mother Cobb's Chicken T., Inc v. Fox* (1937) 10 Cal.2d 203, 206 ["[P]unitive damages . . . are allowed only in addition to recovered actual damages."]; *Cheung v. Daley* (1995) 35 Cal.App.4th 1673, 1676-1677 [same].) Thus, Radin proposes to use a $60,000 credit to erase a $72,629.52 judgment. But he cites no authority for such a piecemeal approach, and the condemnations he has received—well deserved as they are—are not inducements to such leniency. We will therefore modify the judgment by reducing the compensatory and punitive damages to approximately equal sums.

### DISPOSITION

The judgment is modified to provide that Mongoose shall recover from Radin $6,329.52 in compensatory damages and $6,300 in punitive damages. As so modified, the judgment is affirmed. The parties shall bear their respective costs on appeal.

 

                      _____
                      Richman, J.

We concur:

_____
Haerle, Acting P.J.


_____
Brick, J.[*]

---

[*] Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.